UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DONNA MARIE HOLLAND, *et al.*,

    Plaintiffs,

     v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

    Defendants.

Civil Action No. 01-1924  (CKK)

**MEMORANDUM OPINION**
(October 31, 2005)

"May the days flow sweetly with music to your ears and may your time be spent
knowing that the love you have given me shall never become dull in the wind."
- Robert Holland, August 1983 letter to his wife

This action arises from the most deadly state-sponsored terrorist attack against American

citizens prior to September 11, 2001 – the October 23, 1983 Marine barracks bombing in Beirut,

Lebanon, during which 241 American servicemen acting as part of a multinational U.N.-

authorized peacekeeping force were murdered in their sleep by a suicide bomber.  Twenty-eight

year-old Petty Officer Robert S. Holland, son of Charles and Rosemary Holland, brother of

Patrick Holland, husband of Donna Marie Holland,[1] and father of James Robert and Chad Phillip

Holland (collectively, "Plaintiffs"), was one of these unfortunate victims, killed while serving his

country and upholding the greater cause of regional peace and stability.  Due to the nature and

force of the explosion, the Holland family suffered through two more agonizing weeks of waiting

until Robert Holland was conclusively identified as "killed in action."  The memory of this

---

[1] Donna Holland is acting as a plaintiff in this case both as an individual and as the
Administrator of Robert Holland's estate.

horror continues to this day for the Holland family, who – in order to obtain some form of compensation, however small, for their tragic loss – brought this action against the Islamic Republic of Iran ("Iran"); the Iranian Ministry of Information and Security ("MOIS"); the Iranian Islamic Revolutionary Guard Corps ("IRGC"); Hezbollah, Muhsin Rafiq-Dust, former Commander-in-Chief of the IRGC; Ali Akbar Hashemi-Rafsanjani, former Speaker of the Majlis of Iran; Mohammad Rayshari, former Minister of the MOIS; and Ali Akbar Mohtashemi, former Interior Minister of Iran and former Iranian Ambassador to Syria (collectively, "Defendants").

On January 19, 2005, this Court conducted a bench trial to determine the liability of Defendants for this cowardly and inhumane act.  Having reviewed the extensive evidence presented during trial by both lay and expert witnesses, the Court concludes that Plaintiffs Donna, James, and Chad Holland have established their right to obtain judicial relief against Defendants Iran, the MOIS, and the IRGC.  The Court's findings of fact and conclusions of law are set forth below.

## I: PROCEDURAL BACKGROUND

Finally provided a jurisdictional avenue with which to obtain redress for their loss when Congress altered the traditional parameters of the Foreign Sovereign Immunities Act ("FISA"), 28 U.S.C. § 1604, through the 1996 enactment of Section 1605(a)(7) to the FISA, *see* Pub. L. No. 104-132, Ttitle II, § 221(a), Apr. 24, 1996, 110 Stat. 1241 (codified at 28 U.S.C. § 1605(a)(7), and the so-called "Flatow Amendment," *see* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, Div. A, Title I, § 101(c)) [Title V, § 589], 110 Stat. 3009-172 (codified at 28 U.S.C. § 1605 note), Plaintiffs filed a Complaint in the above-captioned action on September 13, 2001.  Plaintiffs then served the required number of copies of the Notice of Suit, Complaint,

and Summons along with their respective translations to Iran, the MOIS, and the IRGC, as required by 22 C.F.R. 93 and 28 U.S.C. § 1608(a)(3).  After service was executed and these three defendants failed to respond within the required time period, Plaintiffs moved for a default judgment on December 9, 2002.  The Court granted Plaintiffs' Motion for Entry of Default against these three defendants on June 3, 2003.  However, given Plaintiffs' stated desire to amend their Complaint, the Court vacated the entry of default, permitted Plaintiffs to file their First Amended Complaint, and ordered that Plaintiffs re-serve Defendants.

After some problems with service, Plaintiffs successfully effectuated service pursuant to 28 U.S.C. § 1608(3) and § 1608(4) against Defendants Iran, the MOIS, and the IRGC in early 2004.  Once again, these defendants failed to respond within the required time period.  After Plaintiffs filed a Motion for Entry of Default and an Affidavit supporting that motion, the Clerk of this Court entered default against Iran, the MOIS, and the IRGC on March 16, 2004.  This Court subsequently approved the entry of default on March 22, 2004.  However, despite the entries of default, the Court is required to make a further inquiry prior to entering any judgment against defendants.  Indeed, the FSIA mandates that "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence that is satisfactory to the Court."  28 U.S.C. § 1608(e); *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 6 (D.D.C. 1998); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 48 (D.D.C. 2003).  "In evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence.'" *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (quoting *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)).  Plaintiffs' evidence may take the

form of sworn affidavits.  *Id.* (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)).

During this time period, the D.C. Circuit issued a decision in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), holding that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government," *id.* at 1033.  Given the obvious implications of the *Cicippio-Puleo* decision for this case, the Court issued an Order on March 31, 2004 inviting briefing from Plaintiffs regarding the issues raised by that decision and the continuing viability of their claims. In responding to the Court's Order, Plaintiff's submitted a Memorandum of Law regarding the *Cicippio-Puleo* decision on April 9, 2004, and provided supplements including additional authority in support of their position on August 31, 2004, and September 13, 2004.  A trial date in this action was then set for January 19, 2005, and – as directed – Plaintiffs submitted a Memorandum in Support of Their Causes of Action on January 5, 2005.  At trial, Plaintiffs presented two expert witnesses:  Dr. Bruce Tefft, an expert in counter-terrorism, and Dr. Jerome S. Paige, an expert on projected economic losses in cases of wrongful death.  Plaintiffs also presented four lay witnesses in support of their claims: Donna Holland, Rosemary Holland, Charles Holland, and Pat Holland.

Following the trial on January 19, 2005, given concerns raised by yet another recent FISA-related decision by the D.C. Circuit, *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004), which held that plaintiffs cannot state a right of action under the "generic common law" or merely "allude[] to the traditional torts . . . in their generic form" but instead must "identify a particular cause of action arising out of a specific source of law," *id.* at 58-59 (quotation

4

omitted), this Court ordered that

> in addition to Plaintiffs planned section of [their post-trial] brief dealing with federal common law, Plaintiffs shall also include a discussion of (1) whether the relevant probate statute governing the administration of decedent's estate allows for the recovery of economic damages under a wrongful death action; and (2) whether the state in which each Plaintiff-claimant resides allows for the collection of damages under solatium for a person of their status in relation to the decedent.

*Holland v. Islamic Republic of Iran*, Civ. No. 01-1924 (D.D.C. Jan. 19, 2005) (minute order requiring further briefing). Plaintiffs, pursuant to the Court's Order, concluded the briefing in this matter with their Post-Trial Brief submitted on February 18, 2005.

## II: FINDINGS OF FACT

After listening to the testimony in the case, reviewing the evidentiary record, personally observing the demeanor and credibility of the witnesses, and making all reasonable inferences to be drawn therefrom in accordance with the Federal Rules of Evidence, the Court sets forth the following findings of fact.

### A.    Historical Background

The Republic of Lebanon is a small, largely mountainous country of approximately 3,800,000 people situated at the eastern edge of the Mediterranean Sea, bordered by Syria on the east and north, and Israel on the south, with a narrow coastline on its west. While Lebanon is one of fifteen present-day countries that comprise what is considered to be "the Cradle of Humanity," Lebanon did not become an independent nation until November 22, 1943, having completed the League of Nations mandate process begun after the disintegration of the Ottoman Empire in World War I. Unlike its regional neighbors, Lebanon did not participate militarily in the 1967 and 1973 Arab-Israeli wars. During this time period, Lebanon was known as "the

Switzerland of the Middle East," with its gleaming capital, Beirut, labeled "the Paris of the

Middle East" given its wide boulevards, French-style architecture, and modernity.

Unfortunately, by the early 1970s, Lebanon had become increasingly destabilized due to

the influx of Palestinian refugees; by 1973, approximately one out of every ten persons living in

Lebanon was a Palestinian refugee, many of whom supported the efforts of the Palestine

Liberation Organization ("PLO") against Israel.  From bases in southern Lebanon, some of these

refugees engaged in guerilla warfare against Israel, leading to reprisals by Israel against these

Palestinian strongholds beginning in 1968.  In April 1975, full-scale civil war broke out in

Lebanon, with the fault lines breaking largely according to religion.  On one side were a number

of mostly Marionite (i.e., Arab Christian) militias, while the other side was comprised of a

coalition of largely Palestinian, Sunni, and Druze forces.  With the war going poorly for the

Marionites by early 1976, Syria sent 40,000 troops into the country to prevent them from being

overrun.  By 1978, however, many of the Maronites had become convinced that the Syrians were

really occupying Lebanon for reasons of their own, and by September of that year, the two groups

were openly feuding; despite this feud, Syrian forces remained in Lebanon, effectively

dominating its government, until their final military withdrawal on April 26, 2005.  The

Lebanese civil war would not come to a complete end until the Arab League-sponsored Taif

Agreement of 1989.  The roughly fifteen-year-long civil war led to the deaths of approximately

20,000 Lebanese, with approximately the same number of Lebanese wounded. *See Peterson*, 264

F. Supp. 2d at 49.

B.      *The Arrival of the 24th Marine Amphibious Unit*

In this post-1975 chaos and power vacuum, the PLO's armed forces continued to use

6

Lebanon as a base to attack Israel with rockets and artillery.  As such, Israel again invaded

Lebanon in 1982 with the objective of evicting the PLO, eventually occupying areas from the

southern Lebanese border with Israel northward into areas of Beirut.  On August 20, 1982, with

the concurrence of the United Nations, a multinational peacekeeping coalition consisting of

American, British, French, and Italian soldiers arrived in the Lebanese capital of Beirut.  In May

of 1983, the 24th Marine Amphibious Unit ("24th MAU") joined this coalition.  The rules of

engagement issued to the servicemen of the 24th MAU made clear that they possessed neither

combatant nor police powers.  Rather, the rules of engagement ordered that the servicemen were

not to carry weapons with live rounds in their chambers, and were not authorized to chamber the

rounds in their weapons unless (1) they were directly ordered to do so by a commissioned officer

or (2) they found themselves in a situation requiring the immediate use of deadly force in self-

defense.  *See* Pl.'s Ex. 5 (December 20, 1983 Report of the DoD Commission on Beirut

International Airport Terrorism Act, October 23, 1983); 1/19/05 Tr. at 15:1-17:13.  As Dr. Tefft's

testimony in this case established, and other courts in similar cases have found, *see Peterson*, 264

F. Supp. 2d at 50, the members of the 24th MAU, and the service members supporting the unit,

were clearly non-combatants operating under peacetime rules of engagement.[2]

Having previously served his country in the Hospital Corps of the United States Navy

from June 1973 to June 1977, Robert Holland chose to re-enlist with the United States Navy in

March 1981 in order to support his growing family, which eventually included his wife, Donna

---

[2] Indeed, the United States Navy listed "terrorist bombing" rather than "killed in action" as the "circumstances surrounding death due to external cause" on its Record of Identification Processing for Robert Holland, indicating the non-combatant nature of the U.S. force.  *See* Pl.'s Ex. 15 (Holland Record of Identification Processing).

Marie Holland, and two young sons – James Robert and Chad Phillip Holland.  Pl.'s Ex. 11

(Enlisted Commissioning Program Application); 1/19/05 Tr. at 77:8-24, 78:24-79:8.  After his

re-enlistment with the United States Navy, Robert Holland went into the battalion aid station

("BAS"), and was involved in the maintenance of medical records in a manner consistent with

the military's code.  1/19/05 Tr. at 79:9-16.  As part of this process, Robert Holland and his

family moved from Illinois, where they had moved temporarily from Kentucky to accommodate

Donna's position in the Air Force, to Camp Lejeune in Jacksonville, North Carolina.  1/19/05 Tr.

at 77:8-24.  Because the United States Marine Corps is actually a division of the United States

Navy and does not have its own medical staff, Robert Holland was stationed in Beirut, Lebanon,

in May 1983 along with the 24th MAU as the corpsman in charge of medical records at the BAS

headquarters division.  1/19/05 Tr. at 82:17-84:9; 87:12-22.  Robert saw this position as a

temporary one, as he had already applied for the Navy's "Enlisted Commissioning Program" in

January 1983.  *See* Pl.'s Ex. 11 (Enlisted Commissioning Program Application); 1/19/05 Tr. at

79:20-81:1.

> C.    *The Iranian Government and the Formation of Hezbollah*

Following the 1979 revolution spearheaded by the Ayatollah Ruhollah Khomeini, the

nation of Iran was transformed into an Islamic theocracy.  The new government promptly drafted

a constitution, still in effect today, which boldly declares its commitment to spread the goals of

the 1979 revolution to other nations.  1/19/05 Tr. at 24:1-26:4.  Towards that end, the

government of Iran spent approximately $50 to $150 million between 1983 and 1988 financing

terrorist organizations in the Near East.[3]  Sensing a power vacuum in the destabilized, war-torn

Lebanon, Iran had begun efforts to export the fundamentalist revolution to the area by early 1982

and had already sent roughly 1500 members of the IRGC to the Beka'a Valley in Lebanon – then

an area outside of the control of the Lebanese government.  1/19/05 Tr. at 26:5-28:20.  These

members of Iran's Revolutionary Guard Corps sought to radicalize the Lebanese Shi'ite

community by recruiting members of a faction (known as "Hezbollah")[4] within a larger group of

moderate Lebanese Shi'ites (known as "Amal").  1/19/05 Tr. at 39:12-40:1.  Through the

encouragement of Iran and its agents, Hezbollah split from Amal and – once it was established as

a separate entity – the government of Iran framed the primary objective of Hezbollah:  to engage

in terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy

modeled after Iran.  1/19/05 Tr. at 32:3-14; Pl.'s Ex. 10 (Magnus Ranstorp, *Hizbollah's

Command Leadership: Its Structure, Decision-Making and Relationship with Iranian Clergy and

Institutions*, *in* TERRORISM AND POLITICAL VIOLENCE, Vol. 6, No. 3 (Autumn 1994)).

Given the testimony provided in this case, and consistent with the findings of other courts

on this matter, *see Peterson*, 264 F. Supp. 2d at 53, it is evident that the formation and emergence

of Hezbollah as a major terrorist organization was due to the government of Iran.  According to

Dr. Tefft, almost since its founding, the Iranian government has provided Hezbollah with roughly

$100 million per annum in financing, and has also provided it with arms, training, and strategic

---

[3] In response to these efforts and the October 23, 1983 Marine barracks attack, the United States designated Iran as a state sponsor of terrorism pursuant to Section 6(h) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j).

[4] "Hezbollah," a translation based on an Arabic word meaning "the party of God," may also be spelled "Hizbollah," "Hizbullah," "Hizballah," "Hezbullah," and "Hizb Allah."

planning in its operations against the United States and Israel.  1/19/05 Tr. at 28:14-20.  The

primary agency through which the Iranian government established and exercised operational

control over Hezbollah was through the MOIS.  The MOIS had formerly served as the secret

police of the Shah of Iran prior to his overthrow in 1979; after the 1979 revolution, the new

regime allowed the MOIS to continue its operations as the intelligence organization of the new

government.  The engagement with and promotion of Hezbollah marked a profound shift for the

MOIS which, until 1983, had focused on the assassination of former Iranian government officials

under the Shah and other Iranian dissidents living in Europe; from 1983 forward, Iran and the

MOIS would look to employ international terrorism against non-Iranians.  1/10/05 Tr. at 37:11-

38:7.

       Based on the evidence presented at trial, the Court concludes that the MOIS was a vital

conduit for Iran's provision of funds to Hezbollah, providing explosives to Hezbollah, and – at

all times relevant to these proceedings – exercising near-complete operational control over

Hezbollah.  *See, e.g.*, Pl.'s Ex. 6 (MAJOR DAVID E. SMITH USMC, THE TRAINING OF TERRORIST

ORGANIZATIONS (1995)); Pl.'s Ex. 10 (Magnus Ranstorp, *Hizbollah's Command Leadership: Its*

*Structure, Decision-Making and Relationship with Iranian Clergy and Institutions*, *in*

TERRORISM AND POLITICAL VIOLENCE, Vol. 6, No. 3 (Autumn 1994)).  Importantly, the

connection between Iran, the MOIS, and the IRGC, on one hand, and Hezbollah, on the other

hand, in the operation culminating in the October 23, 1983 attack on the United States Marine

barracks in Beirut, Lebanon, has been conclusively established by Plaintiffs.  During the months

immediately preceding the October attack, there was a great deal of communication between the

Iranian ambassador to Syria, Ali Akbar Mohtashemi, and various Iranian officials connected with

the MOIS such as Sheik Ol-Islam-Zadi, who closely monitored the whole progress of the operation, frequently met with the heads of Hezbollah, and traveled between Damascus and Tehran.  1/19/05 Tr. at 32:15-33:5, 57:10-59:13.  Indeed, on September 26, 1983, MOIS sent a message to Ambassador Mohtashemi, directing that he contact Hussein Musawi, the leader of the terrorist group Islamic Amal, and to instruct him to have his group investigate attacks against the multinational coalition in Lebanon, and "to take a spectacular action against the United States Marines" in order to force the United States to withdraw militarily from the region.  1/19/05 Tr. at 33:6-34:14, 57:10-59:13; *see also Peterson*, 264 F. Supp. 2d at 54-56.  While it is unclear whether Mohtashemi contacted Musawi, he did contact the leader of the Lebanese headquarters of the IRGC (known as "Kanani") and instructed him to investigate and plan a bombing of the United States Marine barracks in Beirut.  This order led to a meeting in Baalbek, Lebanon, during which Kanani, Sheik Sobhi Tufaili, Sheik Abbas Musawi, and Sheik Hassan Nasrallah – the leaders of Hezbollah – formed the plan to carry out simultaneous attacks against the American and French barracks in Lebanon.  *Id.*

In addition to conceiving and ordering that Hezbollah undertake simultaneous attacks on the American and French forces stationed in Beirut, Iran provided substantial support for the operation in other ways.  First, because the explosives that were to be used in the operation were covered by end-use requirements that mandated only government-to-government sales, the government of Iran actually purchased the explosive materials used in the operation from the government of Bulgaria and then provided the explosives to Hezbollah.  1/19/05 Tr. at 53:15-54:9.  Second, the Iranian government, MOIS, and the IRGC provided complete financial support for the operation, going so far as to use the Iranian embassy in Damascus to cash various checks

to provide funding for Hezbollah.  1/19/05 Tr. at 54:10-23.  Indeed, even at its inception during

the 1982-83 period, Hezbollah was provided $50 million or more by Iran; as Dr. Tefft noted,

"economically Hezbollah would not have existed or been able to be formed without the Iranian

financial support."  1/19/2005 Tr. at 55:13-16.  Third, Iran provided Hezbollah with virtually all

of its operational training, as the members of Hezbollah were highly inexperienced and required

training by the IRGC and other Iranian agencies in various terrorist camps located in Lebanon's

Beka'a Valley, Syria, and outside of Tehran.  1/19/05 Tr. at 56:10-57:9.  More specifically, the

MOIS was directly involved in the preparations for the attack, conducting the relevant

surveillance and intelligence, coordinating with Syrian officials for safe passage for the trucks

and materials used in the attacks, and paving the way for the operation through a variety of

liaising activity.  1/19/05 Tr. at 61:24-62:6.  The IRGC was the primary mover behind the attack

itself, acting as the authorizing agent for the Iranian government in Tehran in addition to

recruiting the individuals involved, training the suicide bombers, preparing the explosives, and

installing the explosives in the trucks in camps located in the Beka'a Valley.  1/19/05 Tr. at 62:7-

22.

    D.    *The October 23, 1983 Bombing*

    Following the meeting in Baalbek, Lebanon, a 19-ton Mercedes Benz cargo truck,

manufactured under license in Iran, was flown from Tehran to Damascus and then driven to the

Beka'a Valley.  1/19/05 Tr. at 20:5-13.  It was then disguised so that it would resemble the water

delivery truck that routinely arrived at the Beirut International Airport, located near the U.S.

Marine barracks, and modified to transport an explosive device.  Another truck was acquired in

Beirut by Hezbollah, brought to the Beka'a Valley, painted red, and outfitted with explosives for

a planned simultaneous attack on the French barracks in Beirut.  1/19/05 Tr. at 20:1-4, 21:18-22.[5]

On the morning of October 23, 1983, members of Hezbollah ambushed the real delivery truck

before it arrived at the U.S. Marine barracks.  Hezbollah then placed an observer on the hill near

the barracks to the operation, and the fake water delivery truck then set out for the barracks,

driven by Ismalal Ascari, an Iranian.  1/19/05 Tr. at 21:2-22:1; *Peterson*, 264 F. Supp. 2d at 56.

At approximately 6:25 a.m. Beirut time, the truck drove passed the Marine barracks,

circling in the large parking lot behind the barracks while increasing its speed.  The truck then

crashed through a concertina wire barrier and a wall of sandbags, entering the barracks.  1/19/05

Tr. at 22:1-17.  Due to the limitations imposed by the standing rules of engagement, the seconds

it took for the Marine sentries to load and chamber their rifles cost them the opportunity to

engage the smiling suicide bomber behind the wheel of the truck.  *See* Pl.'s Ex. 2 (Gunnery Sgt.

Keith A. Milks, *Marines in Beirut III: Disaster, Withdrawal, and Legacy*, Marine Corps News

(Oct. 18, 2003)).  When the truck reached the center of the barracks, the bomb in the truck

detonated.

The resulting explosion was the largest non-nuclear explosion that had ever been

detonated on the face of the earth.  1/19/05 Tr. at 22:1-17.  Due the bomb's use of "bulk form"

pentaerythritol tetranitrate, the force of the explosion was equal to between 15,000 to 21,000

pounds of TNT:  the explosion created a crater in the earth nearly nine feet deep, shredded trees

located 370 feet away, shattered all of the windows at the traffic control tower of the Beirut

---

[5] This simultaneous attack took place approximately eight minutes after the attack on the U.S. Marine barracks on October 23, 1983.  While this vehicle was disguised as the delivery truck that brought vegetables to the French soldiers stationed there for their daily meals, its driver was shot and killed before the vehicle could enter the barracks.  However, the explosive device on this truck was detonated by remote control, killing fifty-six French soldiers.

International Airport over half a mile away, and reduced the four-story Marine barracks to rubble as the concrete building collapsed on itself. *Id.*; Pl.'s Ex. 2 (Gunnery Sgt. Keith A. Milks, *Marines in Beirut III: Disaster, Withdrawal, and Legacy*, MARINE CORPS NEWS (Oct. 18, 2003); *Peterson*, 264 F. Supp. 2d at 56-57. As the result of the Marine barracks explosion, 220 Marines, 18 Sailors, and 3 soldiers were killed, and more than 100 others were wounded.

As the court concluded in *Peterson*, 264 F. Supp. 2d at 58. and as supported by the testimony offered by Dr. Tefft, *see* 1/19/05 Tr. at 22:18-23:20, the Court finds it beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government. Indeed, the sophistication demonstrated in the placement of an explosive charge in the center of the Marine barracks building, the configuration of the bomb for maximum impact, and the devastating effect of the detonation of the charge indicates that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran.

Petty Officer Robert Holland was one of the servicemen killed instantly in the blast. *See* Pl.'s Ex. 15 (Holland Record of Identification Processing). His family learned of the bombing through phone calls early that morning made by friends watching the events on television, 1/19/05 Tr. at 88:12-89:24, 128:25-129:7. However, given the nature of the explosion, the Holland family was forced to wait nearly two weeks until Robert was conclusively identified – a period filled with nerve-racking calls from Donna in Camp Lejeune to Robert's parents in Kentucky as the family searched for any information regarding Robert. As Donna Holland described it,

> That was probably the worst two weeks of my life.  You know, but you don't
> know.  You don't want to admit it.  There's no – I would never wish that on my
> worst enemy.  That is the most horrific two weeks that any family member [] can
> go through, not knowing anything specific about what their future holds, and
> having those two boys [i.e., James and Chad].

1/19/05 Tr. at 95:21-96:2.  Robert's body was finally identified by a childhood injury that he had

in his elbow.  1/19/05 Tr. at 129:10-21.  As his father Charles Holland described the funeral,

> it was a large crowd, and it was cold and it was rainy, and . . . we had some high-
> ranking officers from the military, and it was a typical military funeral, and to this
> day I can – I still hear them playing Taps.  I can hear that all the time . . . . [Life]
> has never been the same.  Never.

1/19/05 Tr. at 140:5-10, 145:19-22.

Robert's death had a profound emotional and substantive impact on the Holland family.

According to his brother Patrick, Robert's parents – Charles and Rosemary Holland – "died a

little bit" after his passing.  1/19/05 Tr. at 153:12-14.  Donna, who never remarried, became a

twenty-three year old widow, forced to raise a three year-old (James) and a one year-old son

(Chad) with limited resources.[6]  As Donna noted, "it was my responsibility, I felt, that I make

sure they turn out to be good people, and well rounded.  But I didn't have the tools or the

interests to encourage those things that they were interested in.  And Bob did."  *Id.* at 112:2-7.

The record is replete with testimony regarding Donna Holland's struggle to support two young

sons, including discussions of their behavioral problems caused – in part – by the lack of a father

figure, their need for medications and counseling since they were five or six years old, the fact

_____

[6] Robert's oldest son, James Holland, was born on February 2, 1980, *see* 1/19/05 Tr. at
73:7-13, and his youngest son, Chad Holland, was born in August 1982, *see* 1/19/05 Tr. at 91:6-
24.  Accordingly, at the time of Robert Holland's death, James was roughly three and one-half
years old, and Chad was a little over one year old.  Robert's wife, Donna Holland, was born in
1960, *see* 1/19/05 Tr. at 65:12-18, and was only twenty-three years old at the time of his death.

that their growth and development was stunted by the loss of the one person who could have brought out their artistic abilities and strengths in writing, and their struggles to define themselves and overcome life-long depression while growing up without the love of their father. *See* 1/19/05 Tr. at 103:20-114:11,143:15-145:22.

Moreover, Robert's premature death at the hands of terrorists also had a significant effect on the finances of the Holland family, depriving his wife and children of between $1.019 and $1.241 million dollars of present value income. *See* Pl.'s Ex. 22 (Economic Loss Data submitted by Dr. Jerome S. Paige); 1/19/05 Tr. at 167:5-171:11. As Robert's mother Rosemary Holland concluded when thinking of her twenty-eight year old son murdered by the efforts of Iran-sponsored terrorism, "we just miss him very much." 1/19/05 Tr. at 133:7-9.

### III: LEGAL DISCUSSION

Every case brought against a foreign state raises two distinct and crucial legal questions. *See Cicippio-Puleo*, 353 F.3d at 1029-30; *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 199 (D.C. Cir. 2004); *Dammarell v. Islamic Republic of Iran*, Civ. No. 01-2224 (JDB), 2005 WL 756090, at *5 (D.D.C. Mar. 29, 2005) (Bates, J.) ("*Dammarell II*"). First, the Court must look to whether it has jurisdiction to hear the claim. In the context of claims implicating the parameters of the FSIA, this jurisdictional determination is guided by an inquiry into whether the case falls within one of the statutory exceptions to the sovereign immunity of a foreign state. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126-27 (D.C. Cir. 2004); *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 232 (D.C. Cir. 2003); *Dammarell II*, 2005 WL 756090, at *5. Second, the Court must consider the actual liability of the defendant foreign sovereign. In the context of the FSIA, this inquiry

16

requires that the Court assess what – if any – causes of action the plaintiffs may bring against the

defendants, and whether the foreign state is liable on any of those claims.  *See Kilburn*, 376 F.3d

at 1133-36; *Ciccippio-Puleo*, 353 F.3d at 1029-30; *Dammarell II*, 2005 WL 756090, at *5.  It is

this second question that has been profoundly impacted by the D.C. Circuit's post-*Cicippio-*

*Puleo* line of cases that call into question many of the key assumptions of many previous FSIA-

related decisions.  *Compare Cicippio-Puleo*, 353 F.3d at 1027 *with Dammarell v. Islamic*

*Republic of Iran*, 281 F. Supp. 2d 105, 194 (D.D.C. 2003) ("*Dammarell I*"); *Cronin v. Islamic*

*Republic of Iran*, 238 F. Supp. 2d 222, 231 (D.D.C. 2003); *Regier v. Islamic Republic of Iran*,

281 F. Supp. 2d 87, 98-99 (D.D.C. 2003); *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 36-41

(D.D.C. 2003).  Given the bifurcated nature of the relevant inquiry, the Court shall address each

question in turn.

> A.     *Jurisdiction*

The FSIA establishes the broad rule that "foreign states," including "a political

subdivision of a foreign state or an agency or instrumentality of a foreign state," 28 U.S.C. §

1603, are immune from suit in the courts of the United States.  *See* 28 U.S.C. § 1604 ("Subject to

existing international agreements to which the United States is a party at the time of enactment of

this Act a foreign state shall be immune from the jurisdiction of the courts of the United States

and of the States except as provided in sections 1605 to 1607 of this chapter.").  However, the

FSIA also sets out certain exceptions to this general rule of immunity for limited categories of

cases.  *See id.* § 1605.  The most recent of the exceptions in the statute was enacted in 1996 and

revokes the sovereign immunity of a foreign state that sponsors acts of terrorism.  *See* Pub. L.

No. 104-132, § 221, 110 Stat. 1214 (codified at 28 U.S.C. § 1605(a)(7)).

Importantly, this latest exception – Section 1605(a)(7) – provides that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case" where

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7).  This provision applies to a foreign state only if three other criteria in the statute are met as well: (1) the foreign state was designated as a state sponsor of terrorism at the time of the terrorist act or as a result of the act; (2) the foreign state was afforded a reasonable opportunity to arbitrate the claim if the act occurred *within the foreign state* against which the claim has been brought; and (3) either the claimant or the victim was a national of the United States at the time of the terrorist act.  *See id.* § 1605(a)(7)(A), (B); *Kilburn*, 376 F.3d at 1127; *Dammarell II*, 2005 WL 756090, at *5.

Upon a review of the evidence presented at the bench trial in this action, the Court concludes that Plaintiffs have satisfied the jurisdictional requirements under Section 1605(a)(7) necessary to circumvent the traditional barrier of sovereign immunity.  First, Iran was designated as a state sponsor of terrorism under Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. 2405(j), and Section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, in response to the April 18, 1983 bombing of the United States Embassy in Beirut, Lebanon, and the October 23, 1983 bombing of the United States Marine barracks in Beirut, Lebanon, and has remained on the State Department list of state sponsors of terrorism ever since.  *See* 22 C.F.R. §

126.1(d); 31 C.F.R. § 596.201.  Second, the bombing occurred within the borders of Lebanon, not Iran, rendering the "opportunity to arbitrate" requirement irrelevant in this case.  *See* 28 U.S.C. § 1605(a)(7)(B).  Third, all of the Plaintiffs in this action are citizens of the United States, as was the victim, Robert Holland.  Fourth, the murder of Robert Holland and 240 other American servicemen certainly qualifies as an "extrajudicial killing," i.e., "a deliberate killing not authorized by previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized people," *see* Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 8 U.S.C. § 1350 note) (incorporated by reference into 28 U.S.C. § 1605(e)).  *See, e.g.*, *Peterson*, 264 F. Supp. 2d at 60-61 (finding that the October 23, 1983 bombing of the United States Marine barracks constituted an "extrajudicial killing"); *Flatow*, 999 F. Supp. at 18 ("[A] suicide bombing . . .is an act of 'extrajudicial killing' within the meaning of 28 U.S.C. § 1605(a)(7).").  Fifth, and finally, as the Court has concluded, *see supra* Section II(C)-(D), Iran, the MOIS, and the IRGC provided "material support or resources" for the killing within the meaning of Section 1605(a)(7) sufficient to constitute a proximate cause in the 1983 United States Marine barracks bombing and the death of Robert Holland.  *See Kilburn*, 376 F.3d at 1126-31 (rejecting the argument that a plaintiff must show that the foreign state's material support was the "but for" cause, and holding that a plaintiff need only establish proximate causation).  Given that Plaintiffs have met the statutory prerequisites, the Court concludes that Section 1605(a)(7) removes the sovereign immunity of Iran, the MOIS, and the IRGC for their role in the barracks bombing.

      *B.*     *Liability*

      Having concluded that Iran, the MOIS, and the IRGC are not immune from suit, the Court

now must turn to an analysis of the causes-of-action that are permitted against a foreign state for

its sponsorship of terrorism.  As noted previously, *see supra* Section I, two recent decisions by

the D.C. Circuit have altered the previous FSIA landscape.  In *Cicippio-Puleo*, 353 F.3d at 1033,

the court held that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two

considered in tandem, creates a private right of action against a foreign government." *Id.*  In

*Acree*, 370 F.3d at 58, the court emphasized that "generic common law cannot be the source of a

federal cause of action" against a foreign state. *Id.*  However, these decisions expressly leave

open the question of whether a cause-of-action against a foreign nation might exist under "some

other source of law, including state law." *Cicippio-Puleo*, 353 F.3d at 1036; *but see id.* at 1033

(indicating that it "cannot be assumed" that there is any cause of action against a foreign state at

all).

   As provided in Plaintiff's Memorandum of Law Responding to the Court's Order

Requesting Briefing on the *Cicippio-Puleo* Decision and Plaintiff's Memorandum of Law in

Support of Their Causes of Action, Plaintiffs maintain that there are several causes-of-action

available against foreign states consistent with the D.C. Circuit's recent rulings.  Plaintiffs

propose that causes-of-action exist under state common and statutory law, federal common law,

the law of foreign countries, the Torture Victims Protection Act, and even the Flatow

Amendment (though the operation of Section 1606 of the FSIA).  Importantly, between the

submission of Plaintiff's filings and this Court's present decision, another judge serving on the

United States District Court for the District of Columbia, the Honorable John D. Bates, issued

two decisions specifically addressing identical contentions made by plaintiffs seeking to recover

for damages sustained in the April 18, 1983 car bombing of the United States Embassy in Beirut,

Lebanon.  *See Dammarell II*, 2005 WL 756090; *Salazar v. Islamic Republic of Iran*, 370 F. Supp.

2d 105 (D.D.C. 2005).  A review of these persuasive decisions, and the authoritative *Dammarell*

*II* decision in particular, indicates that the causes-of-action available against a foreign state are

much narrower than claimed by Plaintiffs in this case.  *See also Price v. Socialist People's*

*Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 132-33 (D.D.C. July 26, 2005) (upon remand

from the D.C. Circuit, choosing to follow the twin holdings of *Dammarell II* and *Salazar*); *Wyatt*

*v. Syrian Arab Republic*, Civ. No. 01-1628(RMU), --- F. Supp. 2d ----, 2005 WL 240152, at *5

(D.D.C. Sept. 30, 2005) (joining in the FSIA analysis propounded in *Dammarell II*).  Guided by

the supple and convincing reasoning set out by Judge Bates in a more exhaustive manner in

*Dammarell II*, 2005 WL 756090, at *7-*32, the Court shall review each potential source

identified by Plaintiffs and examine the plausible resonance of each claim.

      1.    The Collaboration Between Section 1606 and Various Federal Statutes

Section 1606 of the FSIA provides, in relevant part:

> As to any claim for relief with respect to which a foreign state is not entitled to
> immunity under section 1605or 1607 of this chapter, the foreign state shall be
> liable in the same manner and to the same extent as a private individual under like
> circumstances[.]

28 U.S.C. § 1606.  The Supreme Court has stated that this language means exactly what it says –

for instance, where "state law provides a rule of liability governing private individuals, the FSIA

requires the application of that rule to foreign states in like circumstances."  *First Nat'l City Bank*

*v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11, 103 S.Ct. 2591, 77

L.Ed.2d 46 (1983).  As a consequence, a plaintiff should be able to bring a cause of action under

state or common law, federal statutes (where Congress has not indicated otherwise), and even

possibly the law of a foreign country in a Section 1605(a)(7) case, as long as the plaintiff would

be able to bring such a claim against an individual in similar circumstances.  *See Dammarell II*,

2005 WL 756090, at *11.  However, Section 1606, much like the analogous section of its sister

statute, the Federal Tort Claims Act ("FTCA"), *see* 28 U.S.C. § 2674, is a mere pass-through to

causes of action that would exist against private individuals; Section 1606 does not – by itself –

create a cause of action against a foreign sovereign.  *Dammarell II*, 2005 WL 756090, at *12

("For twenty years, courts have read section 1606 as a pass-through to existing causes of

action."); *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 174 (D.D.C. 2002) (rejecting

argument that plaintiffs "unambiguously have a cause of action against Iran by virtue of . . . §

1606" because "the Supreme Court has made clear that this provision does not impact the

substantive liability of a foreign government") (citations omitted).

In this case, Plaintiffs wish to enforce two federal statutes against Iran, the MOIS, and the

IRGC through the pass-through mechanism provided by Section 1606:  (1) the Flatow

Amendment, 28 U.S.C. § 1605 note, and (2) the Torture Victims Protection Act ("TVPA"), 28

U.S.C. § 1350 note.  *See* Pl.'s Mem. of Law in Support of Their Causes of Action at 5-10.  The

Flatow Amendment, passed in the wake of the changes implemented by Section 1605(a)(7),

provides that:

> An *official, employee, or agent* of a foreign state designated as a state sponsor of
> terrorism . . . while acting within the scope of his or her office, employment, or
> agency shall be liable to a United States national or the national's legal
> representative for personal injury or death caused by acts of that official,
> employee, or agent for which the courts of the United States may maintain
> jurisdiction under section 1605(a)(7) . . . for money damages which may include
> economic damages, solatium, pain and suffering, and punitive damages if the acts
> were among those described in section 1605(a)(7).

28 U.S.C. § 1605 note (emphasis added); *see also Flatow*, 999 F. Supp. at 28-34.  The TVPA,

passed in 1992, authorizes a federal statutory cause-of-action against certain individuals for acts

of torture or extrajudicial killing.  The statute provides:

> An *individual* who, under actual or apparent authority, or color of law, of any
> foreign nation –
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to
> that individual; or
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable
> to damages to the individual's legal representative, or to any person who may be a
> claimant in an action for wrongful death.

Pub. L. No. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C. § 1350 note) (emphasis added).

According to Plaintiffs, these "[t]wo federal statutes are applicable to foreign states under

Section 1606's prescription requiring them to be held liable in the same manner as individuals in

like circumstances."  Pl.'s Mem. of Law in Support of Their Causes of Action at 5.

    Unlike the other federal statutes that have been applied to foreign states through the pass-

through provided by Section 1606, *see Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1215

(10th Cir. 1999) (applying the federal RICO statute through the FSIA after a lengthy examination

of the statutes and an analysis of congressional intent); *Mukaddam v. Permanent Mission of*

*Saudi Arabi to the United Nations*, 111 F. Supp. 2d 457, 470 (S.D.N.Y. 2000) (holding that Title

VII applies to foreign states through Section 1606 only after a careful examination of text,

structure, and purpose of Title VII), the Flatow Amendment and the TVPA are not statutes of

general application.  Rather, their very terms confine their scope to officials or agents of foreign

states.  As such, Plaintiffs' assertion that these statutes, through the filter of Section 1606, can be

expanded to apply to foreign states as well as foreign officials is far from established.  Indeed,

other judges on the United States District Court for the District of Columbia have reached wildly

different conclusions on this point in recent post-*Cicippio-Puleo* decisions.  *Compare Dodge v.*

*Islamic Republic of Iran*, Civ. No. 03-252, at 8-10 & n.8 (D.D.C. Aug. 25, 2004) (Jackson, J.)

(concluding that the Flatow Amendment and the TVPA, through Section 1606, create a cause-of-

action against foreign states) *with Dammarell II*, 2005 756090, at *28-*31 (Bates J.) (rejecting

such an approach); *Price*, 384 F. Supp. 2d at 132-33 (rejecting such an approach) (Lamberth, J.);

*Wyatt*, --- F. Supp. 2d ----, 2005 WL 240152, at *5 (rejecting such an approach) (Urbina, J.).

Plaintiffs place a great deal of emphasis on the Judge Thomas Penfield Jackson's decision

in *Dodge*, *see* Pl.'s Mem. of Law in Support of Their Causes of Action at 10-11, which deals

with this issue in a rather cursory manner.  The *Dodge* court begins with the initial proposition

that "[t]he D.C. Circuit's recent ruling in *Cicippio-Puleo* . . . does not undermine the ability of

any victim of terrorism to bring an action under any potentially applicable law otherwise

applicable to individuals.  In particular, *Cicippio-Puleo* did not address § 1606, and therefore did

not consider whether 28 U.S.C. § 1606 provides a basis for asserting federal *statutory* causes of

action against foreign states."  *Dodge*, Civ. No. 03-252, at 9 n.8 (emphasis in original).  From

this uncontroversial reading of *Cicippio-Puleo*, the *Dodge* court makes a significant logical leap

to conclude that "[t]hese two statutes [the Flatow Amendment and the TVPA] provide a basis for

plaintiffs' recovery [against the Republic of Iran] under the facts as found," *id.* at 9, while

providing no analysis into the assumptions underlying its implicit expansion of the Flatow

Amendment and the TVPA.   Upon a review of *Cicippio-Puleo*, the plain text of the relevant

statutes, and their legislative histories, the Court joins the *Dammarell II*, *Price*, and *Wyatt* courts

in concluding that the Flatow Amendment and the TVPA cannot be read to create a private right

of action against a foreign state through Section 1606.  *See Dammarell II*, 2005 WL 756090, at

*28-*31; *Price*, 384 F. Supp. 2d at 132-33; *Wyatt*, --- F. Supp. 2d ----, 2005 WL 240152, at *5.

               i.       *The Flatow Amendment*

As set out first by the court in *Dammarell II*, *id.* at *29-*30, four considerations weigh against expanding the cause-of-action created by the Flatow Amendment to foreign states through Section 1606.  First, the plain text of the Flatow Amendment limits its reach to actions against an "official, employee, or agent of a foreign state."  *See* 28 U.S.C. § 1605 note.  On its face, there is nothing to indicate the Congress intended – or even anticipated – that the statute would apply to foreign states and, given the traditional canon of statutory interpretation "*expressio unius est exclusio alterius*," a court should be cautious in inferring such a significant expansion into an otherwise-silent statute.  Second, the legislative history of the Flatow Amendment does not contain "any indication that Congress intended to take the more provocative step of creating a private right of action against foreign governments themselves." *Cicippio-Puleo*, 353 F.3d at 1031.  Importantly, the legislative history does not contain any evidence that Congress anticipated that the statute would encompass foreign states through the operation of one statute it had enacted only five months earlier – Section 1605(a)(7) – and another than it had created twenty years earlier – Section 1606.  *See Dammarell II*, 2005 WL 756090, at *29.  "Given the proximity in time between the enactment of the Flatow Amendment and section 1605(a)(7), one would expect some indication that Congress expected the Flatow Amendment to apply to foreign states, and the Court would require as much before writing that result into a silent federal statute."  *Id.*

Third, in creating a cause-of-action against an "official, employee, or agent of a foreign state," it appears as though the Flatow Amendment did not create a cause-of-action against a

"private individual" within the meaning of Section 1606.  *See* 28 U.S.C. § 1606 ("[T]he foreign

state shall be liable in the same manner and to the same extent as a *private individual* under like

circumstances.") (emphasis added).  As such, in contrast to RICO, Title VII, and other statutes

that clearly expose a private individual to liability, and therefore may be read to act in

conjunction with Section 1606, the Flatow Amendment is more specific and therefore more

limited:  it is aimed at public officials, not private individuals.  While it may be the case that a

"private individual" within the meaning of Section 1606 can also be considered an "agent"

within the meaning of the Flatow Amendment, there is no reason to believe that Congress was

aware of this potential for converting claims against private individuals into claims against states

when it was enacting the Flatow Amendment.  Due to the inherent nature of the Flatow

Amendment, the Court concludes that it is "far from obvious that Congress would have

understood that the small subset of Flatow Amendment cases that could involve a private party

would lead to wholesale liability for [foreign] states through section 1606."  *Dammarell II*, 2005

WL 756090, at *30.  Fourth, and finally, while *Cicippio-Puleo* does not completely foreclose the

possibility that a cause-of-action might exist under the Flatow Amendment other than of its own

force or through Section 1605(a)(7), the D.C. Circuit specifically emphasized – after a careful

examination of the text and legislative history of the Flatow Amendment and Section 1605(a)(7)

– that neither of those statutes, "nor the two considered in tandem, creates a private right of

action against a foreign government."  *Cicippio-Puleo*, 353 F.3d at 1032.  To circumvent the

clear spirit of the D.C. Circuit's language and allow a Flatow Amendment cause-of-action to

proceed against foreign states through Section 1606 would produce a result that is clearly in

tension with the general drift of recent D.C. Circuit caselaw.  Given these problems, the Court

joins the *Dammarell II* court in concluding that "the cause of action in the Flatow Amendment

cannot be read to apply to foreign states through section 1606." *Dammarell II*, 2005 WL

756090, at *30.

> ii.     *The TVPA*

As the *Dammarell II* court found, "[a] similar analysis disposes of the Torture Victims

Protection Act." *Id.* at *31.  Two factors weigh against using Section 1606 to expand the reach

of the TVPA.  First, on its face, the TVPA authorizes a federal statutory cause-of-action against

"[a]n individual" who subjects victims to torture or extrajudicial killing.  *See* 28 U.S.C. § 1350

note.  By limiting itself only to individuals, the plain language of the text guards against an

expansion of the TVPA to foreign states.  Second, the legislative history of the TVPA indicates

that Congress was quite emphatic in its intent that the TVPA was not to apply to foreign states.

The Senate Report directs that:

> The legislation uses the term "individual" to make crystal clear that foreign states
> or their entities cannot be sued under this bill under any circumstances:  only
> individuals may be sued.  Consequently, the TVPA is not meant to override the
> Foreign Sovereign Immunities Act (FSIA) of 1976, which renders foreign
> governments immune from suits in U.S. courts, except in certain circumstances.

S. Rep. No. 102-249, at 7 (1991).  The House Report contains similar limiting language.  *See*

H.R. Rep. No. 102-367, at 87 (1992) ("Only 'individuals,' not foreign states, can be sued under

the [TVPA].").  These clear manifestations indicate Congress' plain intent in enacting the TVPA

to confine liability for acts of torture and extrajudicial killing to individuals.

In an effort to escape this compelling evidence of congressional intent, Plaintiff offer only

the enactment of Section 1605(a)(7).  *See* Pl.'s Mem. of Law in Support of Their Causes of

Action at 6-7.  The relevant question becomes whether Section 1605(a)(7) reflects a specific

desire by Congress to reverse its earlier clearly expressed intent to create a cause-of-action for torture victims only against individuals.  Upon an analysis, the Court joins the *Dammarell II* court in finding that to overcome the strong evidence of intent aimed at cabining the reach of the TVPA, "the Court would require something more than the textual gymnastics of reading a 1996 statute (section 1605(a)(7)) as operating through a 1976 statute (section 1606) to expand a 1992 cause of action (the TVPA) to [foreign] states."  *Dammarell II*, 2005 WL 756090, at *31.  As such, the Court concludes that "Congress's clearly expressed intent in 1992 should prevail over any speculative intent to the contrary in 1996."  *Id.*  Plaintiffs, therefore, cannot use the Flatow Amendment or the TVPA as the starting point, funneled through Section 1606, for a cause-of-action against Iran, the MOIS, and the IRGC.  Instead, Plaintiffs must look to other sources of law for a sustainable cause-of-action in this case.

2.    Federal Common Law

Plaintiffs next propose causes-of-action arising under federal "common law" as the basis for their claims against Iran, the MOIS, and the IRGC.  *See* Pl.'s Mem. of Law in Support of Their Causes of Action at 11-18 ("In sum, federal common law provides a basis for a full award of damages for victims of state sponsored terrorism.").  Several pre-*Cicippio-Puleo* decisions by federal district courts concluded that federal common law should provide the substantive rule of decision for claims brought under Section 1605(a)(7) to the exclusion of state common law or statutory principles.  *See, e.g.*, *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 87 (D.D.C. 2002) ("Consistent with its approach in previous FSIA cases involving claims for personal injury or death resulting from state-sponsored terrorism, this Court will evaluate plaintiffs' claims under federal common law."); *Wagner v. Islamic Republic of Iran*, 172 F. Supp.

28

2d 128, 134-35 (D.D.C. 2001) ("Specifically, in FSIA cases involving claims for personal injury

or death resulting from state-sponsored terrorism, the application of federal common law will

ensure the greatest level of predictability and uniformity."); *Jenco v. Islamic Republic of Iran*,

154 F. Supp. 2d 27, 33-37 (D.D.C. 2001) (same); *Sutherland v. Islamic Republic of Iran*, 151 F.

Supp. 2d 27, 48-50 (D.D.C. 2001) (same); *Flatow*, 999 F. Supp. at 14-15 (same).  Despite these

previous decisions, the Court joins with the *Dammarell II* court in concluding that

"developments in the law during the past several years, and a careful consideration of the entire

area of jurisprudence, now compel the Court to find that federal common law should not serve as

a rule of decision in the run of section 1605(a)(7) cases."  *Dammarell II*, 2005 WL 756090, at

*23; *see also Price*, 384 F. Supp. 2d at 132-33.

Upon a review, it is evident that multiple problems exist with an application or creation

of federal common law in this context.  *See id.* at *23-*28.  First, the D.C. Circuit in *Bettis v.

Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003), sent a strong signal that Section 1606 is

incompatible with the creation of a federal common law of tort.  In *Bettis*, the court was

presented with the question of whether nieces and nephews of a kidnapped and tortured victim

could obtain recovery for intentional infliction of emotional distress against Iran and the MOIS

under the Flatow Amendment.  *See id.* at 333 (assuming without deciding that a claim could be

asserted against a foreign state under the Flatow Amendment, an argument that was later rejected

in *Cicippi-Puleo*).  In responding to the argument, first propounded by amicus curiae, that the

court should look to federal common law to determine the scope of the emotional distress claim,

the D.C. Circuit explained that the term "'federal common law' seems to us to be a misnomer."

*Id.* at 333.  The court stressed that "it is a mistake, we think, to label actions under the FSIA and

Flatow Amendment for solatium damages as 'federal common law' cases, for these actions are based on *statutory* rights.  Without the statute, the claims would not arise." *Id.* (emphasis in original).  More importantly, the D.C. Circuit went even further in its condemnation of the application of federal common law in the FSIA context, quoting Section 1606 and emphasizing that "we have no free-wheeling commission to construct common law as we see fit." *Id.* at 337.  As the court delineated:

> Of course, because these claims are based on a federal statute, their "extent and nature" are "federal questions." *Burks v. Lasker*, 441 U.S. 471, 476, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 404 (1979).  But that does not, in this case, "authorize the federal courts to fashion a complete body of federal law." *Id.* at 477, 99 S.Ct. at 1837.  Rather, . . . because the FSIA instructs that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, it in effect instructs federal judges to find the relevant law, not to make it.

*Id.* at 338; *see also Burks*, 441 U.S. at 479-80, 99 S.Ct. 1831 (counseling against the creation of an entire body of federal law "out of whole cloth" in situations where it is not shown that state laws poses a "significant threat to [an] identifiable federal policy or interest").  Given the tenor and language of *Bettis*, the Court is quite reluctant to employ federal common law as the basis for a cause-of-action through the prism of Section 1606.

Second, as the *Dammarell II* court described, *Bettis* is a mere reflection of "the modern rule that the federal common law should only be employed in the rarest of circumstances." *Dammarell II*, 2005 WL 756090, at *24 (citing *O'Melveny & Myers v. Fed. Deposit Ins. Co.*, 512 U.S. 79, 87, 89, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (noting that "cases in which judicial creation of a special federal rule would be justified" are "few and restricted" and "extraordinary" (quotation marks omitted); *Resolution Trust Corp. v. Maplewood Invs.*, 31 F.3d 1276, 1294 (4th

Cir. 1994) ("In light of *O'Melveny*, there is a heavy presumption in favor of application of a rule of decision in accordance with Virginia law as opposed to the creation of a federal rule of decision."); Erwin Chemerinsky, *Federal Jurisdiction* § 6.1, at 350 (3d ed. 1999) ("There long has been a strong presumption against the federal courts fashioning common law to decide cases.")).  Importantly, a court should craft a federal common law rule only in cases where there are both (1) "significant federal interests" and (2) a "significant conflict between some federal policy or interest and the use of state law."  *Boyle v. United Tech. Corp.*, 487 U.S. 500, 506, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

The principal rationale identified by Plaintiffs for the use of federal common law in Section 1605(a)(7) and other FSIA-related cases is that it promotes "predictability and uniformity" in a sensitive area of jurisprudence.  *See* Pl.'s Mem. of Law in Support of Their Causes of Action at 14.  Unfortunately, an interest in uniformity is the "most generic (and lightly invoked) alleged federal interests," *O'Melveny*, 512 U.S. at 88, 114 S.Ct. 2048, and – as the Supreme Court has stressed – if uniformity, facilitation of nationwide litigation, the elimination of state-by-state research, and the reduction of uncertainty "qualified as an identifiable federal interest, we would be awash in 'federal common-law' rules," *id.*; *see also United States v. Kimbell Foods, Inc.*  440 U.S. 715, 730, 99 S.Ct. 1448, 59 L.Ed.2d 211 (1979) ("generalized pleas for uniformity" not a basis for resort to federal common law).  Due to these considerations, the goal of uniformity has frequently been rejected "as a basis for the fashioning of a federal common law rule in the specific context of mass disasters and even terrorist attacks overseas." *Dammarell II*, 2005 WL 756090, at *25.

31

For instance, the Supreme Court declined to read the pass-through Warsaw Convention as an "implicit authorization for national courts to create uniformity" in the case of injury or death during international air transportation, as the Court explained that the pass-through element of the Convention (similar to Section 1606) does not "empower us to develop some common-law rule – under cover of general admiralty law or otherwise – that will supersede the normal federal disposition." *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 231, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996); *see also Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 6, 11 (2d Cir. 1996) (holding that the federal concern "between the Warsaw Convention's goal of uniformity and the unruliness of applying multiple state laws" is "insufficient to justify imposition of federal common law"); *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272 (11th Cir. 1999) (applying Florida law in Warsaw Convention case involving airplane crash in Colombia). Courts have also reached the same conclusion in the context of the Federal Tort Claims Act ("FTCA"), holding that the presence of a "pass-through" provision similar to Section 1606 in the statutory scheme entails that courts are merely to apply existing causes-of-action, and are not to develop a new federal rule. *See Dammarell II*, 2005 WL 756090, at *26 (citing *Devlin v. United States*, 352 F.3d 525, 532 (2d Cir. 2003) ("[T]he FTCA's basic thrust was decidedly not to create a federal common law of torts, but rather – as expressed in the final clause of section 1346(b)(1) and in section 2674 – to tie the government's liability – albeit subject to a host of qualifications – to the disparate and always evolving tort law of the several states.")). Finally, courts have declined to fashion a common law rule in cases brought under the other exceptions in Section 1605. *Id.* (citing *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549, 561 (S.D.N.Y. 2001) ("[T]he FSIA does not provide for a federal substantive law rule of decision but operates

merely as a 'pass-through' to state law principles."); *In re Aircraft Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 948 F. Supp. 747, 758 (N.D. Ill. 1996) ("As for federal common law, the only reason cited in favor of creating and applying a federal common law of pre-impact fear damages is uniformity.  This base desire to achieve an identical result in every case is insufficient to override the interest of each injured person's domiciliary state.")).

Ultimately, this Court joins with the *Dammarell II* court in holding that "[w]here courts have rejected a federal common law rule under the Warsaw Convention, other section 1605 cases, and the Federal Tort Claims Act, finding each time that such a rule would be incompatible with a 'pass-through' statute and cannot be justified by an interest in uniformity," *Dammarell II*, 2005 WL 756090, at *26, there is no compelling reason to conclude that the value of uniformity somehow creates a "unique federal interest" requiring the creation and application of federal common law in this instance.  Rather, given the dictates of *Bettis* and the modern presumption against federal common law, the Court finds that – given the absence of conflict between some important federal policy or interest and the application of state law here – Plaintiffs cannot use federal common law in conjunction with Section 1606 as the basis of their claims against Iran, the MOIS, and the IRGC.

### 3.   Foreign Law

Plaintiffs also suggest that generic "international law," or the laws and customs of Lebanon or Iran may provide a foundation for their Section 1605(a)(7) claims against Iran, the MOIS, and the IRGC.  *See* Pl.'s Mem. of Law in Support of Their Causes of Action at 12-13; Pl.'s Mem. of Law Regarding the *Cicippio-Puleo* Decision at 11-12.  Upon a review of the relevant caselaw and legal framework, the Court joins with the *Dammarell II* court in concluding

it is clear that in either case, foreign law should not supply the rule of decision.  *See Dammarell II*, 2005 WL 756090, at *32.

First, the application of Lebanese law – i.e., the law of the place of the tort – would be inappropriate in this situation.[7]  In the absence of a contractual choice of law by the parties, the District of Columbia – the forum state – employs a "constructive blending" of the "governmental interests" analysis and the "most significant relationship" test.  *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 193 (D.C. Cir. 1999); *cf. Bucheit v. Palestine Liberation Org.*, Civ. No. 00-1455 (GK), 2003 WL 24011414, at *5 (D.D.C. Aug. 15, 2003) (applying the choice of law rules of the foreign state in a FSIA case); *Lloyds Bank PLC v. Republic of Ecuador*, Civ. No. 96-1789(DC), 1998 WL 118170, at *6 (S.D.N.Y. Mar. 16, 1998) (same).  In interpreting the District of Columbia's unique "choice of law" mixture, the D.C. Court of Appeals has described the blending as follows:

> In determining which law governs the dispute, this court has used the "government interests analysis."  In applying that analysis, we also consider the factors enumerated in the Restatement,  § 145, to assist in identifying the jurisdiction with the "most significant relationship" to the dispute.

*Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40 (D.C. 1989).  As the *Hercules* court explained, "[u]nder the government interests analysis as so refined, we must evaluate the government policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review."  *Id.*  As for the "most significant relationship" component of the analysis, the court focused on Section 145 of the Restatement of the Conflict of Laws, which identifies four relevant factors: (1) "the

---

[7] Under this analysis, the law of Iran would be equally inapplicable.

place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place of the relationship, if any, between the parties is centered." *Id.* (citing Restatement (Second) of Conflict of Laws § 145 (1971)).  Importantly, Restatement Section 145 also references the factors in Section 6 of the Restatement. *Id.*  These other Section 6 factors for consideration include the needs of the interstate and international systems, the relevant policies of the forum, the relevant policies of other interested states, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied. *Id.*

While the law of a foreign country has provided the cause-of-action in some cases arising out of mass disasters that occurred on foreign soil, *see Dammarell II*, 2005 WL 756090, at *19 (citing examples), the "government interests" approach governing in the first instance in the District of Columbia ensures that the law of the domicile of the plaintiff is more often applied, as courts are usually swayed by the strong and often paramount interest of the plaintiff's jurisdiction in guaranteeing redress to its citizens, *id.*  Given the characteristics of this particular case certainly heightens the interests of the domestic forum and diminishes the interests of the foreign state.  The injuries suffered by Plaintiffs and the loss of Robert Holland's life are the result of a intentional, well-planned state-sponsored terrorist attack on U.S. servicemen that occurred for purely political reasons.  The United States has a unique interest in having its domestic law – rather than the law of a foreign nation – used in the determination of damages in a suit involving such an attack.  *See* Restatement (Third) of Foreign Relations Law § 402(3) (1987) (noting that the United States has an interest in projecting its laws overseas for "certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a

35

limited class of other state interests") & cmt. g. (this principle is "increasingly accepted as

applied to terrorist and other organized attacks on a state's nationals by reason of their

nationality, or to assassination of a state's diplomatic representatives or other officials").  While

these considerations do not justify the use of federal common law, "they do elevate the interests

of the United States to nearly it[s] highest point."  *Dammarell II*, 2005 WL 756090, at *20.

Accordingly, under the District of Columbia choice of law analysis, it is clear that domestic law –

and not the law of Lebanon – should control.  *Id.*; *see also Price*, 384 F. Supp. 2d at 132-33

(using District of Columbia choice of law analysis to apply domestic state law rather than foreign

law); *Wyatt*, --- F. Supp. 2d ----, 2005 WL 240152, at *5-*6 (using District of Columbia choice

of law analysis to apply domestic state law rather than the law of Turkey or Syria).

　　　　Second, an application of some form of "international law" would also be inappropriate

in the present context.  Importantly, as the Supreme Court emphasized in *Sosa v. Alvarez-*

*Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), not every "violation" of

international law is remedial by a private right of action in United States courts, and there is a

"high bar" on recognition of international principles as part of the common law, enforceable by

such private action, *id.* at 2763.  The *Sosa* Court, in considering whether acts committed in

violation of the law of nations could be redressed using a combination of international law and

the Alien Tort Statute, 28 U.S.C. § 1350, concluded that "federal courts should not recognize

private claims under federal common law" if the allegations concerned "violations of any

international law norm with less definite content and acceptance among civilized nations than the

historical paradigms familiar when § 1350 was enacted."  *Id.* at 2765.  According to the Court,

this leaves only a "narrow set of violations of the law of nations" actionable under the Alien Tort

Statute.  *Id.* at 2761.  Given this limiting language, the fact that Congress has entered this field

and spoken through Sections 1605(a)(7) and 1606, and the inherent problems in blending

international law, federal common law, and Section 1606, *see supra* Section III(B)(2), the Court

finds that an application of international law would not be appropriate in this setting.  *See*

*Damarell II*, 2005 WL 756090, at *27-*28, *32; *Price*, 384 F. Supp. 2d at 132-33; *Wyatt*, --- F.

Supp. 2d ----, 2005 WL 240152, at *5-*6.

        4.      <u>State Law</u>

      While the Court has rejected Plaintiffs' contention that some combination of Section

1606, the Flatow Amendment, the TVPA, federal common law, foreign law, and international

law provides a basis for their causes-of-action against Iran, the MOIS, and the IRGC, the Court

concludes that – at least in the circumstances of this case – Plaintiffs may assert causes-of-action

against the defendants under state common and statutory law.  "As a general rule, state law

should provide a cause of action against a foreign nation in a section 1605(a)(7) claim."

*Dammarell II*, 2005 WL 756090, at *17 (citing *First Nat'l City Bank*, 462 U.S. at 621, 103 S.Ct.

2591 ("Where state law provides a rule of liability governing private individuals, the FSIA

requires the application of that rule to foreign states in like circumstances."); *Pescatore*, 97 F.3d

at 12 ("[T]he FSIA . . . operates as a 'pass-through' to state law principles."); *Virtual Def. & Dev.*

*Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 14 (D.D.C. 2001) ("[A]s a general matter,

state substantive law is controlling in FSIA cases.")); *see also Brink's Ltd. v. South African*

*Airways*, 93 F.3d 1022, 1030-32 (2d Cir. 1996) (noting that "state law generally controls in FSIA

cases").  Here, as previously described, state law is not pre-empted or otherwise displaced by

federal law, and the governing choice of law principles do not point the Court in the direction of

the law of a foreign state.  As the *Dammarell II* court noted, *Damarell II*, 2005 WL 756090, at *17, given that state law provides the cause-of-action in mass disaster cases under the FSIA where corporations owned by foreign governments are defendants, *e.g.*, *In re Aircraft Disaster*, 948 F. Supp. at 756, in wrongful death actions arising out of terrorist attacks where a private corporation is the defendant, *e.g.*, *Pescatore*, 97 F.3d at 13, and in every other category of damages' actions where foreign states are defendants, *e.g.*, *First Nat'l City Bank*, 462 U.S. at 621, 103 S.Ct. 2591, it is not surprising that state common and statutory law provides the substantive causes-of-action for Plaintiffs' claims in this case.  Indeed, "[f]ar from *preempting* state law in section 1605(a)(7) cases, the FSIA *invites* the application of state law through section 1606."  *Dammarell II*, 2005 WL 756090, at *16; *see also Price*, 384 F. Supp. 2d at 132-33 (following *Dammarell II* approach and applying the laws of California and Texas as the foundation for plaintiffs' causes-of-action arising out of torture by the Libyan government); *Wyatt*, --- F. Supp. 2d ----, 2005 WL 240152, at *6-*7 (following *Dammarell II* approach and applying Tennessee and Texas law as the foundation for plaintiffs' causes-of-action arising out of hostage taking by the Syrian government); *Salazar*, 370 F. Supp. 2d at 114 (using *Dammarell II* approach to apply Illinois state law as foundation for plaintiff's causes-of-action against Iran arising out of 1983 U.S. embassy bombing).

## IV: CONCLUSIONS OF LAW

While the Court has determined that state law provides the applicable causes-of-action for Plaintiffs under the circumstances of this case, the Court still must decide exactly which state's law to apply to each plaintiff.  There are two conceivable choices of law left in this case, given the Court's determination that it would be inappropriate to apply the law of the place of the tort

(i.e., Lebanon):  the Court could apply the law of the forum state, i.e., the District of Columbia, or it could apply the law of the domicile state of the plaintiff.  Upon analysis, the District of Columbia can lay claim to very little interest: all plaintiffs (as well as the decedent) are from outside the District of Columbia, the attack occurred outside of the District of Columbia, and Iran, the MOIS, and the IRGC have no particular connection to the District of Columbia.  While choosing the law of the District of Columbia would certainly allow for greater uniformity and ease in applying a single set of legal standards, these considerations – certainly relevant under the Restatement – are trumped when another location otherwise has "a significantly greater interest than does the District" in the cause-of-action.  *See Dammarell II*, 2005 WL 756090, at *19 (citing *Mims v. Mims*, 635 A.2d 320, 324-25 (D.C. App. 1993); *Kaiser-Georgetown Cmty. v. Stutsman*, 491 A.2d 502, 509 n.10 (D.C. App. 1985) (efficiency concerns enter the analysis only where the interests of "both jurisdictions are equally weighty" to "tilt the balance in favor of applying the law of the forum state")).  Given the strong and recognized interest of the domicile state in ensuring that its citizens are compensated for harm, the law of the forum state in this case must give way to the law of the domicile of the plaintiff.  *See Dammarell II*, 2005 WL 756090, at *22-*23 (law of domicile prevails in FSIA context under District of Columbia choice of law rules); *Price*, 384 F. Supp. 2d at 132-33 (same); *Wyatt*, --- F. Supp. 2d ----, 2005 WL 240152, at *6-*7 (same); *Salazar*, 370 F. Supp. 2d at 114 (same).

> A.      *Choosing the Appropriate State Laws to Apply*

In this case, Plaintiffs fall into two categories:  (1) the estate of Robert Holland, the decedent in the attack; and (2) the surviving family members of Robert Holland.  As to the first category, the claims of a decedent's estate – brought here by Donna Holland as the Administrator

of Robert Holland's estate – are "'traditionally governed by the laws of the decedent's domicile,' because such an approach 'respects the decedent's deliberate choice to make his or her home in a state and be governed by the laws of that state.'" *Dammarell II*, 2005 WL 756090, at *21 (citing *In re Air Crash Disaster*, 948 F. Supp. at 758; *Datskow v. Teledyne Cont'l Motors Aircraft Prods.*, 807 F. Supp. 941, 944 (W.D.N.Y. 1992) (holding that the law of New York, which was the decedent's domicile, should apply in wrongful death and survival action claims brought by decedents' estates, even though administratrix of one of the estates was a resident of Pennsylvania); *Doetsch v. Doestsch*, 312 F.2d 323, 328 (7th Cir. 1963) ("The decedent's domicile is a traditional starting point of reference in the solution of many problems involving decedent's estates.")).

However, certain difficulties emerge at this point in determining the decedent's domicile at the time of his death on October 23, 1983.  Upon Robert Holland's re-enlistment in March 1981, the Holland family – Robert, Donna, and James[8] – moved from Rantoul, Illinois, to North Carolina, where the family eventually settled in Camp Lejeune in the city of Jacksonville. 1/19/05 Tr. at 77:8-24; Pl.'s Ex. 11 (Enlisted Commissioning Program Application).  However, North Carolina follows the rule that "[t]o establish domicile in North Carolina there must not only be a residence, but also an intention to make the location of that residence a home or to live there permanently or indefinitely."  *Hernandez v. Santiago*, 140 F. Supp. 2d 567, 570 (E.D.N.C. 2001); *see also Martin v. Martin*, 253 N.C. 704, 707, 118 S.E.2d 29, 32 (1961); N.C.G.S.A. § 50-18.  North Carolina's rule of domicile is implicitly consistent with the view of the Second

---

[8] Chad Holland, Robert's other son, had not yet been born at the time of the move. 1/19/05 Tr. at 91:6-17.

Restatement, which states that "[a] person does not usually acquire a domicil of choice by his presence in a place under physical or legal compulsion." Restatement (Second) of Conflicts of Laws § 17 (1988 Revisions); *see also* 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3617, at 567 (2d ed. 1984 & Supp. 2003) ("A serviceman is presumed not to acquire a new domicile when he is stationed in a place pursuant to orders; he retains the domicile he had at the time of entry into the service."); *Agee v. Bush*, Civ. No. 95-1909 (RCL), 1996 WL 914110, at *4 (D.D.C. Aug. 26, 1996). In the commentary to Section 17, the Second Restatement suggests that a member of the armed services may, in certain circumstances, acquire the domicile of the place where he is stationed, but only if he regards that place as his home. *Id.* at comment c. The comment further states that "[s]uch an attitude on his part may be difficult to establish in view of the nomadic character of military life and particularly if he intends, upon the termination of his service, to move to some other place." *Id.*

Based upon these considerations and the present record, the Court concludes that Robert Holland was a domiciliary of the State of Kentucky at the time of his death. There is no indication on the record that Robert – who, as a corpsman in the U.S. Navy, was required to take extended trips at sea – spent significant time in North Carolina or intended to reside in the state following his military service. Rather, Robert had spent a good portion of his adolescence in Kentucky, lived most of his life in that state, and intended to return to school within the state to complete his education. *See* 1/19/05 Tr. at 123:1-7; Pl.'s Ex. 11 (Enlisted Commissioning Program Application). Moreover, upon his death, his wife and two children moved back to Kentucky, where both of Robert's parents still lived – indicating that the Holland family still saw Kentucky as "home." Finally, and perhaps most importantly for the purposes of determining

41

Robert Holland's intent, in his will, drafted and effectuated on September 1, 1981 in Camp

Lejeune in North Carolina, Robert identifies himself as "a legal resident of the State of

Kentucky," notes that his presence in North Carolina is "by virtue of my military obligation," and

expresses his desire for the will to be interpreted according to the laws of the State of Kentucky.

*See* Pl.'s Ex. 19 (Will of Robert Holland).[9]   Because the Court concludes that Robert Holland

was a domiciliary of the State of Kentucky at the time of his death, Kentucky state law will shape

the rights and relief of his estate in the present action.

Plaintiffs Donna, James, Chad, Charles, Rosemary, and Patrick Holland each fall into the

second category for choice of law purposes:  each are survivors (family members) of the

decedent.  "In the case of survivors, the dominant rule is that the law of the state of the survivor

(rather than the decedent) should provide the rule of decision, on the theory that the survivor is

usually the injured party in these claims, asserting his or her own claims for economic losses, loss

of solatium, intentional infliction of emotional distress, and the like."  *Dammarell II*, 2005 WL

756090, at *21 (citing *Pescatore*, 97 F.3d at 5, 13-14 (applying Ohio law to determine

compensatory damages in case arising out of airline crash in Scotland, because "the harms

inflicted on the plaintiff (loss of society, loss of financial contribution, and loss of services) are

harms inflicted on her in Ohio," where she was domiciled); *Patten v. Gen. Motors Corp.*, 699 F.

Supp. 1500, 1506 (W.D.Okla. 1987) (suggesting that the state of domicile of survivors "has a

---

[9] While technically Robert Holland lived in Rantoul, Illinois, from January 1981 to April 1981, *see* Pl.'s Ex. 11 (Enlisted Commissioning Program Application), he had spent almost all of the previous five years in Kentucky and was only in Illinois for his wife's basic training in the Air Force, *see* 1/19/05 Tr. at 75:2-78:20.  Donna Holland was honorably discharged from the Air Force pursuant to the Air Force's "breach of contract" on April 7, 1981, removing the need for the Holland family to stay in Illinois.  *Id.*  Given these facts, it is clear that Robert Holland could not be considered a legal resident of Illinois during his time in the U.S. Navy.

strong interest in the welfare of the surviors and in ensuring that they are fully compensated for their loss"); *Stevens v. Cessna Aircraft Co.*, 599 F. Supp. 481, 483 (E.D.Pa. 1984) (applying the law of Pennsylvania to wrongful death action brought on behalf of decedent with uncertain domicile, because Pennsylvania "has a strong interest in suits brought for wrongful death where the beneficiaries are Pennsylvania citizens")).  While some of the Plaintiffs have moved at least once since the October 23, 1983 bombing of the United States Marine barracks, the basic rule is that "[t]he state of domicile for these plaintiffs should be assessed as of the date that the . . . bombing occurred."  *Id.* at *22; *see also Perloff v. Symmes Hosp.*, 487 F. Supp. 426, 428 (D.Mass. 1980) ("Although plaintiffs now reside in California, their residence and domicile at the time of the accident are the relevant residence and domicile.  At the time of the accident the plans to change the family domicile were not definite and fixed, and if the choice of law were made to turn on events happening after the accident, forum shopping would be encouraged."); *Roll v. Tracor, Inc.*, 140 F. Supp. 2d 1073, 180 n.5 (D.Nev. 2001) ("It is well settled in tort cases that for the purpose of determining domiciliary in choice-of-law analyses the relevant consideration is the domiciliary of the plaintiff at the time of the accident.").

In an analysis similar to the one conducted for Robert Holland, the Court concludes that his wife Donna Holland was a resident and domiciliary of the State of Kentucky at the time of his death.  Likewise, given the traditional rule that "[t]hroughout its minority, a legitimate child's domicile continues to be that of the father unless separation of the parents or the death of the father results in custody passing to the mother, at which point her domicile becomes controlling," Wright, et al., *supra* § 3615, at 560, the Court finds that Robert Holland's sons, James and Chad Holland (minors at the time of the accident), were residents and domiciliaries of the State of

Kentucky at the time of the accident.  Robert Holland's parents, Charles and Rosemary Holland, were residents of Kentucky at the time of the bombing.  *See* 1/19/05 Tr. at 123, 134.  Finally, Robert Holland's brother, Patrick Holland, was also a resident of Kentucky on October 23, 1983. *See* 10/25/05 Patrick Holland Aff. at 1, ¶ 2.

> B.      *Application of the Relevant State Laws*

Plaintiffs' First Amended Complaint sets out claims for wrongful death (Count I), solatium (Count II), and punitive damages (Count III).  *See* First Am. Compl. ¶¶ 35-52.  It is the case that in Kentucky, "[a]t common law, no civil action could be maintained for the wrongful death of a person."  *Sturgeon v. Baker*, 312 Ky. 338, 227 S.W.2d 202, 203 (Ky. App. 1950). However, two Kentucky statutes do provide for recovery under a wrongful death theory as alleged by Plaintiffs.  The first, initially enacted in 1854 and developed through the result of Section 241 of the Constitution of 1890, provides:

> Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it.  If the act was willful or the negligence gross, punitive damages may be recovered.  The action shall be prosecuted by the personal representative of the deceased.

Ky. Rev. St. § 411.130(1).[10]  The second statute, initially enacted in 1856 and amended in 1866,

_____

[10] Section 241 of the 1890 Constitution laid the groundwork for Section 411.130 by providing:

> Recovery for wrongful death – Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every case, damages may be recovered for such death, from the corporations and persons so causing the same.  Until otherwise provided by the law, the action to recover such damages in all cases shall be prosecuted by the personal representative of the deceased person. The General Assembly may provide how the recovery shall go and to whom belong; and until such provision is made, the same shall form part of the personal estate of the deceased person.

44

is complementary to Section 411.130, expanding the reach of a wrongful death action in some

ways and limiting it in other ways.  This second statute – Section 411.150 – provides:

> The surviving spouse and child, under the age of eighteen (18) or either of them,
> of a person killed by a careless, wanton, or malicious use of a deadly weapon, not
> in self-defense, may have an action against the person who committed the killing
> and all others aiding or promoting, or any one (1) of them.  In such actions the
> jury may give vindictive damages.

Ky. Rev. Stat. § 411.150.  Section 411.150 could apply under the circumstances of this case, as

Kentucky's definition of a "deadly weapon" includes "[a] weapon of mass destruction," thereby

including the explosive device that killed Robert Holland and 240 other United States

servicemen in the U.S. Marine barracks bombing.  *See* Ky. Rev. Stat. § 500.080(4)(a).  The two

statutes do not provide two different causes-of-action, and double recovery is impermissible;

rather,

> Section [411.130] merely enlarges the remedy and gives a right of action not
> authorized by [Section 411.150].  And so, if the widow or minor children will not
> prosecute the action under [Section 411.150], then the personal representative
> may do so under [Section 411.130], and, if the personal representative fails or
> refuses, the widow or minor child may sue.

*Howard's Adm'r v. Hunter*, 126 Ky. 685, 104 S.W. 723, 725 (Ky. App. 1907); *see also Wells'*

*Adm'r v. Lewis*, 213 Ky. 846, 281 S.W. 996, 997 (Ky. App. 1926) ("The two sections harmonize

perfectly when read and considered together . . . ."); *Sturgeon*, 312 Ky. 338, 227 S.W.2d at 339-

40.

Importantly, by its very terms, recovery under Section 411.150 is limited only to the

surviving spouse and minor children.  *See* Ky. Rev. Stat. § 411.150.  As such, it creates a cause-

of-action only for Donna Holland, Robert's wife, and his two children, James and Chad Holland,

who were minors at the time of the terrorist attack.  Section 411.130 also limits recovery: "When

the decedent is survived by a widow and children, as in this case, Kentucky's wrongful death statute does not allocate any damages to the decedent's siblings or parents; rather, half of the damages goes to the widow and half goes to the children." *Boggess v. Price*, Civ. No. 04-5671, 2005 WL 1385943, at *1 (6th Cir. June 10, 2005) (quoting Ky. Rev. Stat. § 411.130(2)); *see also Shepherd v. Shelter Mut. Ins. Co.*, 2 S.W.3d 794, 796 (Ky. App. 1999) ("Thus, since Shepherd was Bray's sister and Bray left children surviving him, Shepherd does not qualify as a survivor entitled to benefits under KRS 411.130 and KRS 304.39-020(14)."). Similarly, one other statutory cause-of-action for wrongful death is also unavailable for Charles and Rosemary Holland, Robert's parents: while Section 411.135 allows for a wrongful death action for parents to recover damages for "loss of affection and companionship" due to the death of a child, by its very terms, Section 411.135 requires that the child must be a minor at the time of his or her death. *See* Ky. Rev. Stat. § 411.135. Because Robert Holland was not a minor at the time of his death, Charles and Rosemary Holland cannot recover under this section. Accordingly, under Kentucky law, only Plaintiffs Donna, James, and Chad Holland have viable causes-of-action against Iran, the MOIS, and the IRGC through Section 1605(a)(7) and Section 1606 for the wrongful death of Robert Holland.[11]

Plaintiffs have also brought a claim for solatium (Count II), which they characterize as a dual claim for "loss of consortium" and "intentional infliction of emotional distress." *See* Pl.'s Post-Trial Mem. of Law Responding to Court's Order at 8-16. Under Section 411.145, Kentucky allows that "[e]ither a wife or a husband may recover damages against a third person for loss of

---

[11] The statute of limitations problems inherent in Section 411.130, *see* Ky. Rev. Stat. §§ 44.110(3), 413.180, are overcome by equitable tolling and the 10 year extension granted by the 1996 enactment of Section 1605(f). *See* 28 U.S.C. § 1605(f).

consortium, resulting from a negligent or wrongful action of such third person."  Ky. Rev. Stat. §

411.145(2).  "Consortium" is defined as "the right to services, assistance, aid, society,

companionship, and conjugal relationship between husband and wife, or wife and husband."  *Id.*

§ 411.145(1).  However, Donna Holland's claim for loss of consortium is not sustainable on the

present facts.  Importantly, "[a] claim for loss of consortium is viable only for the period of time

between the date of injury and the date of death.  It does not reach beyond."  *Clark v. Hauck Mfg.*

*Co.*, 910 S.W.2d 247, 252 (Ky. 1995); *see also Brooks v. Burkeen*, 549 S.W.2d 91, 92 (Ky. 1977)

("This claim fails because it is well settled law that her recovery would be limited to damages

which she sustained before her husband's death.  His death occurred instantaneously at work.

Consequently, she lost no services, society, fellowship or affectionate relations prior to death.")

(citations omitted).  Accordingly, because Robert Holland died instantaneously from his injuries,

*see* Pl.'s Ex. 15 (Holland Record of Identification Processing), Donna Holland has no cause-of-

action for loss of consortium.  *See Clark*, 910 S.W.2d at 252 ("To extend the damages for loss of

consortium beyond the date of death would result in a double recovery for the surviving spouse

beyond that which the wrongful death statute affords.  This was never available under the

common law."); *Estate of Presley v. CCS of Conway*, Civ. No. 03-117(H), 2004 WL 1179448, at

*2 (W.D.Ky. May 18, 2004) ("Kentucky case law has been clear that a surviving spouse cannot

claim loss of consortium after the death of the other spouse.").[12]

    In contrast, Plaintiffs James and Chad Holland can sustain a common law cause-of-action

---

[12] The *Estate of Presley* court predicted that the Kentucky Supreme Court would not use
the reasoning in *Giuliani* to extend spousal recovery for loss of consortium after death.  As such,
it reaffirmed the traditional limitations that would prevent recovery by Donna Holland under this
theory.  *See Estate of Presley*, 2004 WL 1179448, at *2-*3.

for loss of consortium against the relevant defendants.  While not traditionally allowed in

Kentucky, *see Burkeen*, 549 S.W.2d at 92 (declining opportunity to expand loss of consortium

claim to cover loss of parental care of minor children because "no court or legislature in the

United States has yet seen fit to recognize such an action"), the Supreme Court of Kentucky in

*Giuliani v. Guiler*, 951 S.W.2d 318 (Ky. 1997) recognized for the first time the right of minor

children to claim loss of parental consortium following the death of a parent.  The *Giuliani* court

stated that public policy goals now recognized the importance of compensating children for the

loss of parental love and nurturing when the loss was caused by another person's wrongdoing.

*Id.* at 320.  The court concluded that loss of parental consortium was the converse of the related

claim of the parents for a "loss of a child's consortium," which Kentucky already recognized by

statute, *see* Ky. Rev. Stat. § 411.135, and that "there [was] no legal distinction" between the two

claims.  *Id.* at 321.  Importantly, the *Giuliani* court further held that such a loss of consortium

claim "is independent and separate from a wrongful death action and shall not be treated as a

single claim."  *Id.* at 322.  Accordingly, James and Chad Holland may bring a separate cause-of-

action under the *Giuliani* expansion of "loss of consortium" because they were minors at the time

of Robert Holland's death.  *But see Clements v. Moore*, 55 S.W.3d 838, 840 (Ky. App. 2000)

(holding that children who were adults at the time of parent's wrongful death may not recover

under this theory).  Unfortunately, no other Holland family member can obtain relief for loss of

consortium under Kentucky law.

Upon an analysis of Kentucky's restrictive caselaw, the Court concludes that no Plaintiff

may recover damages for "intentional infliction of emotional distress" under a solatium theory,

despite the claims of Plaintiffs.  *See* Pl.'s Post-Trial Mem. of Law Responding to Court's Order

48

at 12-16.  "The Kentucky Supreme Court first recognized the tort of intentional or reckless

infliction of emotional distress, also known as the tort of outrage, in *Craft v. Rice*, 671 S.W.2d

247 (Ky. 1984)."  *Mineer v. Williams*, 82 F. Supp. 2d 702, 706 (E.D.Ky. 2000).  However, as

numerous decisions since *Craft* have emphasized, the Kentucky Supreme Court only adopted

Restatement (Second) of Torts Section 46(1) in *Craft*, not Section 46(2).  *See Allen v. Clemons*,

920 S.W.2d 884, 886 (Ky. App. 1996).  Importantly, Section 46(2) states:

> Where such conduct is directed at a third person, the actor is subject to liability if
> he intentionally or recklessly causes severe emotional distress:
> (a) to a member of such person's immediate family who is present at the time,
> whether or not such distress results in bodily harm; or
> (b) to any other person who is present at the time, if such distress results in bodily
> harm.

Restatement (Second) of Torts § 46(2).  Because the conduct at issue was directed at a third

person (Robert Holland) and not Plaintiffs in this case, the only conceivable cause-of-action that

Robert Holland's family members could have for intentional infliction of emotional distress

would be under Restatement (Second) of Torts Section 26(2); however, because Kentucky has

not adopted that section – and has refused to do so since the *Craft* decision – family members of

an individual upon whom the conduct was directed may not recover.  *See Allen*, 920 S.W.2d at

886 (denying claim because plaintiffs' action was based on the section of the Restatement that

the Supreme Court of Kentucky did not adopt); *Mineer*, 82 F. Supp. 2d at 707 ("Similarly in the

present case, the publication by defendant of any allegations regarding Chris Mineer was not

directed at Ms. Mineer.  Therefore, as a third party she cannot establish a cause of action for the

tort of outrage under Kentucky law.").[13]  Accordingly, Plaintiffs cannot recover under a

---

[13] Even if Kentucky had adopted Section 46(2), in all likelihood Plaintiffs would still be
without a cause-of-action for intentional infliction of emotional distress, as "recovery under this

combination of a solatium/intentional infliction of emotional distress theory.

Finally, Plaintiffs claim that punitive damages are appropriate against Iran, the MOIS, and the IRGC for their actions vis-á-vis the bombing that took Robert Holland's life.  *See* First Am. Compl. ¶¶ 49-52 (Count III).  As the Court has concluded, 28 U.S.C. § 1605(a)(7) provides the jurisdictional hook for Plaintiffs' state law causes-of-action in this case.  *See supra* Section III(A).  Section 1606 limits, in some ways, the relief that plaintiffs may obtain through actions brought through Section 1605(a)(7), providing that while the "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," "a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages."  28 U.S.C. § 1606.

In this case, three defendants are before this Court:  the Islamic Republic of Iran, the MOIS, and the IRGC.  Iran, as the foreign state itself, is clearly not liable for punitive damages under the restrictions explicit in Section 1606.  Likewise, because the core functions of the MOIS – Iran's Ministry of Foreign Affairs – are "governmental" in nature, the entity must be considered the foreign state of Iran itself rather than its agent.  As such, MOIS is also not liable for punitive damages in this case.  *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234-35 (D.C. Cir. 2003) (concluding that MOIS is equivalent to the foreign state of Iran itself, and denying punitive damages); *see also* 1/19/05 Tr. at 25:9-20 (Dr. Tefft likens the MOIS to the CIA).  As to the third relevant defendant, the IRGC, this determination is a bit more difficult.  The *Roeder* court set down a categorical approach for determining if an entity should be considered the foreign state

---

theory is typically limited to circumstances in which a plaintiff *observes* a sudden, traumatic injury to a family member." *Mineer*, 82 F. Supp. 2d at 707 n.6 (citations and internal quotation marks omitted).  Here, no Plaintiff observed the actual bombing.

itself for the purposes of the FSIA: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Id.* at 234.  This Court, in a decision entered prior to the D.C. Circuit's ruling in *Roeder*, concluded – in rather summary fashion – that the IRGC could not be considered to be the state of Iran, and was instead its agent or instrumentality; as such, the Court concluded that punitive damages against the IRGC were appropriate.  *See Higgins v. Islamic Republic of Iran*, Civ. No. 99-0377(CKK), 2000 WL 33674311, at *7 (D.D.C. Sept. 21, 2000) (Kotelly, J.).  However, the D.C. Circuit's strict dichotomy outlined in *Roeder* and its determination that "[a] nation's armed forces are clearly on the governmental side" compels the Court to re-examine its conclusion vis-á-vis the IRGC as stated in *Higgins*.  Given the contours of *Roeder*, an analysis of the factual testimony presented in this case regarding the IRGC is in order.

At trial, Dr. Tefft described the IRGC, i.e., the Iranian Revolutionary Guard Corps, in this manner:

> There were a couple of Iranian governmental, quasi-governmental departments involved with this [bombing].  The Iranian Revolutionary Guard Corps is a – it's a paramilitary organization.  It's an organization that probably does not have a counterpart in the Western world, *per se*.  The closest metaphor I could give you probably would be the Brown Shirts, the SA of the Nazi Party during World War II.  This is the personal party militia of the Islamic Party and the Supreme Leader of Iran, the Ayatollah.  He set it up to guard the revolution.  The Ayatollah and the religious government that is – was and is currently in Iran took power in 1979, and they overthrew the shah of Iran at that time and not – and did not completely trust – did not trust at all the existing government, the department of defense, the security services and that sort of thing.
>
> So to protect themselves against a counterrevolution, they set up their own parallel shadow military force and that's the revolutionary guard corps.  It numbers about 500,000 troops and is not as heavily armed as a regular military, i.e., it doesn't have a lot of tanks and missiles and that sort of thing.  It's basically a light infantry force, but it is a large force and it is the main body guard of the Islamic

51

> Party and the ruling mullahs.  It is not subject to the Ministry of Defense or the
> regular Iranian army.

1/19/05 Tr. at 24:3-25:8.  Based upon these facts, Plaintiffs contend that "[r]ooted in Islamic

fundamentalist zeal, the core functions of the IRGC are to export the theology and 'revolution' of

religious fanatics by violent means.  The IRGC is therefore clearly not a 'political subdivision' of

Iran and punitive damages should be awarded . . . ."  Pl.'s Post-Trial Mem. of Law Responding to

Court's Order at 17.

Two recent cases have dealt with the issue of the IRGC in the post-*Roeder* era.  In

*Salazar*, Judge Bates recognized that the IRGC does not easily fit into *Roeder*'s "dichotomy of

government entities with primarily governmental or commercial functions," but ultimately

concluded that "in its primarily military function and close association with MOIS, the IRGC is

more like an 'armed force' under the ultimate command of the leadership of the Iranian

government (if not is political functionaries), than like a commercial agency or instrumentality of

the state."  *Salazar*, 370 F. Supp. 2d at 116.  According to the *Salazar* court, "[t]he IGC's

mission is thus difficult to distinguish from the MOIS:  both promulgated Islamist revolution in

Lebanon on behalf of the revolutionary Iranian government, and the two shared operational

responsibilities in preparing for the Embassy bombing and other terrorist activities."  *Id.*  Finding

"no meaningful distinction between the two organs for purposes of FSIA's punitive damages

regime," the *Salazar* court declined plaintiff's efforts to obtain punitive damages against the

IRGC.  *Id.*  Similarly, in *Welch v. Islamic Republic of Iran*, Civ. No. 01-863(CKK), 2004 WL

2216534 (D.D.C. Sept. 27, 2004) (Kay, J.), Magistrate Judge Alan Kay concluded that the

IRGC's core functions were analogous to those of the MOIS and concluded that the IRGC was "a

political subdivision of Iran." *Id.* at *5.

Given the strict dichotomy set down by *Roeder*, the Court joins with the *Salazar* and *Welch* courts in concluding that Plaintiffs may not obtain punitive damages against the IRGC. However, the Court is much more hesitant than these courts to conclude that the IRGC is actually equivalent to "the foreign state itself" – i.e., Iran.  Rather, from a historical and factual perspective, the IRGC – like the Brown Shirts – appears to be a true "instrumentality" of the dominant party of the state, used by the government and its officials in largely "illegal," paramilitary, and *sub rosa* activities to supplement the goals of its official agencies and foreign policy needs.  However, *Roeder*'s reading of Section 1606, which is binding on this Court, essentially subverts the natural reading of "agency or instrumentality thereof."  By limiting "agency or instrumentality" only to commercial entities, the *Roeder* court ensured that punitive damages cannot be obtained against organizations such as the IRGC.  However, perhaps overlooked by the *Roeder* court, suits against commercial entities – i.e., "non-governmental" entities – likely would not implicate the FSIA or its concerns in the first instance.  Instead, a lawsuit against a foreign commercial entity would have to look outside of the FSIA and Sections 1605 through 1607 for its jurisdictional hook.  As such, through its narrow reading of Section 1606 in general, and "agency or instrumentality" in particular, the *Roeder* court has essentially read the phrase "agency or instrumentality" out of Section 1606 and deprived FSIA plaintiffs the kind of deterrent, punitive damages envisioned by Congress when it enacted Section 1605(a)(7), the Flatow Amendment, and Section 1606.[14]  Indeed, Plaintiffs here are left in a rather peculiar

---

[14] Under the *Roeder* court's reading of Section 1606, the Court finds it difficult to conceive of a situation where a plaintiff could ever gain punitive damages against an FSIA defendant, even though Section 1606 clearly contemplates such damages.  Such a reading

situation legally:  while Kentucky law, which provides the basis for their causes-of-action, allows

for punitive damages for their claims, Plaintiffs cannot recover punitive damages against any

Defendant in this case, even when one of the defendants is a paramilitary organization serving a

party – not the state itself – and exists outside of the control of the regular military.  However,

bound by the D.C. Circuit's reading of the relevant statute, the Court concludes that Plaintiffs

may not obtain punitive damages as a form of redress in this case.

> C.     Damages

As set forth previously, *see supra* Section IV(B), Plaintiff Donna Holland may recover

under a wrongful death action against Iran, the MOIS, and the IRGC – with one-half of the total

wrongful death recovery going to her, and the other half going to her children with Robert, James

and Chad Holland.  Moreover, James and Chad Holland are also provided with another cause-of-

action by Kentucky law – loss of parental consortium – and therefore they may also be

compensated for the fifteen and seventeen years of parental love and affection lost when the

defendants effectuated their terrorist attack that killed Robert Holland on October 23, 1983.[15]

Kentucky law provides no redress for Robert's parents, Charles and Rosemary Holland, or his

brother, Patrick Holland, in these circumstances.  Moreover, Plaintiffs cannot obtain punitive

damages against the defendants in this case.

To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must

prove that the consequences of the foreign state's conduct were "'reasonably certain' (i.e., more

---

appears to be contrary to the plain intent of Congress.

[15] The age of majority in Kentucky is eighteen, except with respect to alcohol and the care and treatment of children with disabilities, for whom the age of majority is twenty-one.  *See* Ky. Rev. Stat. § 2.015 (Baldwin 1994).

likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit's] application of the American rule on damages." *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003); *see also Salazar*, 370 F. Supp. 2d at 115-16; *Price*, 384 F. Supp. 2d at 134.  Here, it was reasonably certain that Robert Holland's death and the attendant suffering of his family would occur given the defendants' actions.  The evidence adduced at trial in this case in this case shows conclusively that Defendants Iran, the MOIS, and the IRGC were engaged in a deliberate and unfortunately successful campaign to destroy the U.S. Marine barracks, cause the massive loss of American lives, and compel the United States to withdraw from Lebanon.  Furthermore, Plaintiffs' expert generated a reasonable estimate of Plaintiffs' damages based on well-reasoned assessments of Robert Holland's lost salary and earning potential.

In terms of pure financial compensation, Dr. Jerome S. Paige testified about the lost earnings to the Holland family caused by Robert's premature death.  *See* 1/19/05 Tr. at 156:5-171:17.  Using a methodology that this Court concludes is reliable, Dr. Paige set out two possible present value incomes for the Court's consideration.  *See* Pl.'s Ex. 22 (Economic Loss Data submitted by Dr. Jerome S. Paige).  The first possibility, representing a present value amount of $1,019,735, was based on essentially "a plain-vanilla generic set of assumptions that relate to anybody who might have . . . [Robert Holland's] age, his race, his educational attainment of two years in college . . . ."  1/19/05 Tr. at 169:1-9; 170:15-22.  This figure was based on "Federal data collected by the U.S. Department of Labor, Bureau of Labor Statistics, and . . . a survey which is referred to as the current population survey."  1/19/05 Tr. at 160:10-19.  The second possibility, representing a present value amount of $1,241,486,

> takes into account [Robert Holland's] exact position in the military, it makes the assumption that he would have been accepted into the commissioned officer training program that he had applied for at the time, that he would have completed his military career in 20 years altogether, . . . [and] would have received a pension from that military career . . . and would have gotten a job in the regular civilian workforce commensurate with his training in the military up to that point.

1/19/05 Tr. at 169:22-170:14, 170:23-171:11.  Upon a review of the two possibilities before it, the Court concludes that the second figure – $1,241,486 – more accurately and precisely reflects the lost earnings caused by Robert's murder that would have otherwise accrued to the Holland family.  As such, under a pure "lost earnings" subdivision to the compensatory damages due Plaintiffs Donna, James, and Chad Holland under their wrongful death cause-of-action, the Court concludes that they are entitled to $1,241,486 in damages.

Unfortunately for Plaintiffs, recovery under the wrongful death cause-of-action in Kentucky is inherently limited.

> The damages recoverable in the wrongful death action have been clearly defined and limited almost from its inception.  The damages are such sum as will fairly and reasonably compensate the decedent's estate for the destruction of the decedent's earning power, and do *not* include the affliction which has overcome the family by reason of the wrongful death.

*Dep't of Educ. v. Blevins*, 707 S.W.2d 782, 783 (Ky. 1986) (emphasis in original) (citing cases); *Rivas v. Doering*, Civ. No. 01-346(H), 2002 WL 1313127, at *2 (W.D.Ky. May 22, 2002) (same); *see also Boggess*, 2005 WL 1385943, at *4 ("the wrongful death action is a cause of action that inures to the benefit of decedent's estate, as a result of, not the person injury suffered by the *decedent*, but rather, injuries to his estate caused by his wrongful death") (quoting *Jaco v. Bloechle*, 739 F.2d 239, 242 (6th Cir. 1984)).  Accordingly, because Plaintiff Donna Holland has no other viable cause-of-action outside of her wrongful death claim, and her wrongful death

claim allows for no further damages outside of Robert Holland's lost earnings, her damage award is therefore complete. The Court therefore awards her one-half of the $1,241,486 owed to Robert Holland's estate under Kentucky law – i.e., $620,743.  Pursuant to Kentucky state law, *see* Ky. Rev. Stat. 411.130(2)(b), Plaintiffs James and Chad Holland are to share equally in the other one-half of the award – i.e., $310,371.50 each in compensatory damages for their father's wrongful death.

As set forth above, Plaintiffs James and Chad Holland also have a separate cause-of-action against the relevant defendants – loss of parental consortium as set forth in the *Giuliani* decision.  Unlike a wrongful death action or a spouse's claim for loss of consortium, the Kentucky loss of parental consortium cause-of-action contains no inherent limitations on damages. *See Charash v. Johnson*, 43 S.W.3d 274, 279 (Ky. App. 2000) ("the claim for loss of parental consortium does not end at the parent's death").  Plaintiffs James and Chad Holland assert that the evidence submitted and legal principles underlying their case supports the separate awards of $12,000,000 each in compensatory damages "for loss of consortium and solatium" caused by the defendants' malfeasance. *See See* Pl.'s Post-Trial Mem. of Law Responding to Court's Order at 18.  Such a request is relatively in-line with previous FSIA precedents. *See, e.g.*, *Salazar*, 370 F .Supp. 2d at 117 (awarding victim's daughter, who was 13 months old at the time of her father's death in the 1983 U.S. Embassy bombing in Beirut, $5 million for intentional infliction of emotional distress and loss of consortium, and awarding her widowed mother $10 million in damages for the same claims).

At the time of Robert Holland's death, his oldest son James was roughly three and one-half years old, having been born on February 2, 1980, *see* 1/19/05 Tr. at 73:7-13, and his

youngest son Chad was a little over one year old, having been born in August 1982, *see* 1/19/05

Tr. at 91:6-24.  In this case, the actions of Defendants Iran, the MOIS, and the IRGC robbed

James and Chad of a father at any extremely young age, a loss that was exceedingly detrimental

to their upbringing and well-being.  The record is rife with information regarding Donna

Holland's struggle to support two young sons, their behavioral problems caused – in part – by the

lack of a father figure, the fact that their growth and development was stunted by the loss of the

one person who could have brought out their artistic abilities and strengths in writing, and their

struggles to define themselves and overcome life-long depression while growing up without the

love of their father.  *See* 1/19/05 Tr. at 103:20-114:11,143:15-145:22.  All evidence in the record

indicates that Robert was – and would have been – an exceptional and attentive father; indeed,

Robert, given his training as a corpsman, was able to take the primary responsibility in actually

delivering Chad in the hospital.  *See* 1/19/05 Tr. at 91:18-92:1.  Given the present record, the

Court concludes that an award of $12,000,000 each is also appropriate to James and Chad

Holland as compensation for the loss of parental consortium that they suffered due to the actions

of Defendants' on October 23, 1983.

      D.    *Pleading Deficiencies*

      Although Plaintiffs suggested a variety of different sources of law for their claims in the

briefs, none of these sources appear in their First Amended Complaint.  There, Plaintiffs only

reference the generic torts of wrongful death and solatium, and request punitive damages;

Plaintiffs do not explain if these are common law or statutory claims, and do not identify a

specific source of law for any of their claims.  *See generally* Pl.'s First Am. Compl.  In their

briefing, however, Plaintiffs offered a number of "coherent alternatives," and one of them – state

common and statutory law – is viable as the source of the claims made by Donna, James, and Chad Holland.  Following in the footsteps of *Dammarell II*, 2005 WL 756090 at *32, *Cicippio-Puleo*, 353 F.3d at 1036, *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 183 (D.D.C. 2005), and *Welch*, 2004 WL 2216534, at *4, the Court shall grant Plaintiffs' leave to amend their First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(b) to explicitly incorporate Kentucky state law and the sustainable causes-of-action arising under it. In doing so, the Court notes that judgment for Plaintiffs Donna, James, and Chad Holland shall be contingent upon their filing of a Second Amended Complaint that adequately identifies their causes-of-action and the legal basis for those claims.

## V: CONCLUSION

For the reasons set forth above, the Court enters judgment for Plaintiffs Donna, James, and Chad Holland against Defendants Iran, the MOIS, and the IRGC in the amounts specified in Section IV(c), subject to an amendment of Plaintiffs' First Amended Complaint setting forth in greater specificity Plaintiffs' causes-of-action that must be filed by Monday, November 14, 2005. An Order accompanies this Memorandum Opinion.


Date:   October 31, 2005


           */s/*                      
COLLEEN KOLLAR-KOTELLY
United States District Judge